CASE 74—PETITION EQUITY—JUNE 13.

# Belknap v. City of Louisville et al.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

1. ELECTIONS—ISSUE OF BONDS—SUBMISSION OF QUESTION MUST BE AT GENERAL ELECTION.—The submission of a question to the voters is an "'election" as expressly declared by section 147 of the Constitution of Kentucky; and as section 148 of that instrument provides that "not more than one election in each year shall be held in this State, or in any city, town, district or county thereof, except as otherwise provided in this Constitution," there being no exception in favor of the submission of such questions, they must be submitted at the general election.   (Overruling Fidelity Trust and Safety Vault Co., v. City of Morganfield, 96 Ky., 564.)

2. NECESSARY VOTE.—Under the provision of section 157 of the Constitution that no county, town, etc., shall be authorized to become indebted beyond the current revenue for that year, without

the consent of two-thirds of the voters voting at an election to be held for that purpose, the assent of two-thirds of the electors actually voting at the general election when the question is submitted, is necessary to carry it, and not merely two-thirds of those who vote upon that question. And in this case it is obvious that both the statute and the ordinance under which the question was submitted, require the favorable vote of two-thirds of those voting at the general election.

R. H. BLAIN FOR APPELLANTS.

No brief in the record.

H. S. BARKER AND HUMPHREY & DAVIE FOR APPELLEES.

1. The submission of the question whether the bonds should or should not be issued was not necessarily had at the regular November election, as it might have been done at any other time by proper notice. (Fidelity Trust and Safety Vault Co. v. City of Morganfield, 96 Ky. 564.) And, therefore, the election "held for that purpose," under the provisions of section 157 of the Constitution, although held on the regular election day in November at which officers were elected, was a separate and distinct election, and in estimating the requisite number of voters to carry the proposition, it is immaterial how many votes may have been cast in other elections held on the same day; the only question is how many voted "at an election to be held for that purpose." (Carroll Co. v. Smith, 111 U. S., 556; McCrary on Elections, 3d ed., sec. 173; Thompson's Commentaries on the Law of Corporations, sec. 728; Constitution of Ky., secs. 157, 158, 147, 148; Ky. Stats., secs. 2840, 1459; Armour Bros. v. Board of Finney Co., 41 Fed. Rep., 321; Walker v. Oswald, 68 Md., 155; State v. Barnes, 3 North Dak., 319; Metcalfe v. City of Seattle, 1 Wash., 302; Gillespie v. Palmer, 20 Wis., 544; Commissioners v. Winkley, 29 Kansas., 36; Cass v. Johnson, 95 U. S., 369; State v. Echols, 41 Kansas, 1; Holcomb v. Davis, 56 Ill., 413; Case of Prohibitory Amendments, 24 Kansas, 721; Smith v. Proctor, 130 N. Y., 319; Douglass v. Pike County, 101 U. S., 685; Knox Co. v. Ninth National Bank, 147 U. S., 99; Dillon Mun. Corp., 4th ed., sec. 277; Cooley's Const., Lim., 6th ed., pp. 779, 780; Vance v. Austell, 45 Ark., 406; Yesler v. Seattle, 1 Wash., 308 (29 Pac., 1014); Lamb v. Cain, 129 Ind., 486 (29 Northeastern, 22); Richardson v. McReynolds, 114 Mo., 641; Hogg v. Baker, 17 Ky. Law Rep., 577; Dunavan v. Green, 57 Ill., 67; Chestnut v. Hood, 68 Ill., 138; Melvin v. Lindsey, 72 Ill.,

67; State v. Mayor of St. Joseph, 37 Mo., 270; State v. Binder, 38 Mo., 450; Sudbury v. Stearns, 21 Pick., 154.)

2. The total value of the taxable property of the city of Louisville was at the "assessment next before the last assessment previous to the incurring of the indebtedness," $104,832,324, and the total indebtedness of the city was $9,150,863, so that an additional indebtedness of $1,000,000 would not make the debt of the city more than ten per cent. of the assessed value of taxable property.

3. But even if the addition of this indebtedness to that of the already, existing debt would have made the total more than ten per cent. of the value of its taxable property, the park system of Louisville is a public improvement, commenced prior to the adoption of the present Constitution, and, therefore, comes within the exception provided for in section 158 of the Constitution. (City of Lexington on App., 96 Ky., 258; Holzhauer v. City of Newport, 94 Ky., 396; Byrne v. City of Covington, 15 Ky. Law Rep., 33; Aydelotte v. Town of South Louisville, 16 Ky. L. R., 166; Beard v. City of Hopkinsville, 95 Ky., 239.)

JUDGE Du RELLE DELIVERED THE OPINION OF THE COURT.

This suit was brought for an injunction to restrain the city of Louisville from issuing a million dollars of bonds for park purposes. There were two grounds alleged for the injunction—the first and main ground urged being that at the election of November 6, 1894, the question of the issue of bonds was submitted to the voters of the city, and that the proposition to issue did not receive the assent of two-thirds of the voters thereof, within the meaning of section 157 of the Constitution and section 2854 of the Kentucky Statutes.

It appears that at the election there were cast in the city of Louisville a total of 32,425 votes; that on the question of the issue of park bonds there were cast only 9,024 votes, of which 6,483 were cast in favor of the issue, and 2,721 against it.

Section 157 of the Constitution provides that "no county,

city, town, taxing district or other municipality shall be authorized or permitted to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose, and any indebtedness contracted in violation of this section shall be void."

It is contended for appellants that the total number of votes cast at the election in favor of the bond issue being less than two-thirds of the whole number cast at the election, the bond issue failed to carry upon the ground that the section referred to requires that two-thirds of the total vote cast at the election shall be cast in favor of the issue.

Appellees contend that the words "two-thirds of the voters thereof voting at an election to be held for that purpose" restrict us to the consideration of the total number of votes cast for and against the question of issuing bonds, and that, therefore, more than two-thirds of the votes of those voting "for that purpose" were cast in favor of the bond issue.  In other words, appellee's contention is that in the "election held for that purpose" only the votes cast for that purpose—for and against the bond issue—can be considered, and that no account can be taken of votes cast for other purposes, such as the election of officers, although cast on the same day.

Great stress was laid by appellee's counsel upon the argument that the legislature might have provided for the submission of the question of the bond issue at a special election held on a different day from the regular annual election, and at which no other question or election was determined; and, as at such special election only the votes cast upon the bond issue could be considered, though the vote might,

and probably would be much less than the vote cast at the regular annual election, therefore, "a question submitted to the voters" is not in any way dependent on or connected with an election of officers, although submitted on the same day and by means of the same ballots; and, as the Constitution left it to the legislature to determine whether the question should be submitted on the day of the general election or on.some other day, the action of the legislature in fixing the submission for the same day as the general election did not commingle or make them interdependent. In support of this contention the case of Fidelity Trust & Safety Vault Co. v. Morganfield, 96 Ky., 564, is relied on. In that case it was held that the submission of an issue of bonds for municipal purposes might be upon a different day from that of the general election.

After careful consideration by a full bench a majority of the court are unable to adhere to the doctrine laid down in that opinion. Section 147 of the Constitution requiring elections by the people to be by secret official ballot provides that "the word 'election' in this section includes the decision of questions submitted to the voters, as well as the choice of officers by them."

Section 148 provides that "not more than one election in each year shall be held in this State or in any city, town, district or county thereof, *except as otherwise provided in this Constitution.* All elections of State, county, city, town or district *officers* shall be held on the first Tuesday after the first Monday in November."

It is otherwise provided as to elections for school trustees by section 155, which excepts those elections from the provisions of sections 145 to 154 inclusive, and as to elections for taking the sense of the people of a county, city, etc., as to

whether liquors shall be sold therein by section 61, which provides "all *elections* on this question *may* be held on a day other than the regular election days."

In this section the word "election" is used in the sense provided in section 147, and this provision indicates clearly that the word is used in section 148 to include questions submitted to the people, for otherwise there would be no need for the permission given by section 61. By section 152 vacancies in the General Assembly may be filled at a special election.

It seems clear that the provision of section 148, that no more than one election each year shall be held in this State or in any city, town, district or county thereof, except as otherwise provided in the Constitution, applies to questions submitted to the voters, and the only provision otherwise in the Constitution in reference to such questions is the one in regard to the submission of questions as to the sale of liquor.

When it is considered that the manifest purpose of the framers of the Constitution, and of the people who ratified and gave it effect, was to put limitations upon the power of the local authorities in the matter of incurring debts, which would result in oppressive taxation, and even to limit the power of the people themselves improvidently to authorize the assumption of such obligations, the wisdom of the restriction of such elections to the day of the general election is evident.   Not only is a much larger vote usually brought out on the occasion of the general election, but the people at large are usually better informed of the matters upon which they are entitled to vote by reason of the greater interest taken and the fuller discussion of such matters.

We come now to the main question presented in this record.   By section 157 of the Constitution it is provided:" No city . . . shall be authorized or permitted to become indebt-

ed, in any manner or for any purpose, to an amount exceed-
ing, in any year, the income and revenue provided for such
year, without the assent of two-thirds of the voters thereof
voting at an election to be held for that purpose."

The object of this provision was to limit the power of the
local authorities and the people to burden themselves and
their posterity with taxation, except upon full consideration
and by the assent of the people given understandingly. In
order to effect that object it was provided that no city should
be authorized to become indebted in excess of the current
year's revenue without the assent of two-thirds of the voters
thereof voting at an election to be held for that purpose.
It was sought to protect the people from their own improvi-
dence and that of their local officials, and such a construc-
tion must be given to the Constitution as will give effect to
its manifest purpose.

There could be but one election in the year except in the
cases specially provided for. This question was to be sub-
mitted to the people at that election. It was one election,
though held for several purposes, and was in no sense a
collection of elections held on the same day. One of the
purposes of the election was to determine this question,
which, under authority of the Constitution, the statute and
the ordinance passed in accordance therewith was to be
submitted to the voters of the city. It was required that
two-thirds of the voters of the city voting at such election
should give their *assent* to the bond issue. Assent implies
action, and is not mere failure to dissent. At the election
held for the purpose of electing various officers, and for the
additional purpose of determining the question of the bond
issue, there were cast 32,425 votes, and of all those voters
voting at the election held for those purposes but 6,483, less

than one-fifth .of the total number, gave their *assent* to the proposition to impose on the city of Louisville the burden of an additional debt of a million of dollars.

The authorities which, to a greater or less degree, bear upon this question are numerous and conflicting. It may be conceded that under a provision like the one under consider-- ation it is not necessary that two-thirds of those entitled to vote should actually vote in favor of the proposition, and that as was said by the Supreme Court of the United States in Carroll County v. Smith, 111 U. S., 565, "the words 'qualified voters' as used in the Constitution, must be taken to mean not those qualified and entitled to vote, but those qualified and actually voting. In that connection a voter is one who votes; not one who, though qualified to vote, does not vote."

To the same effect are many authorities cited by appellees, and the reason of the rule is well stated in People v. Wiant, 48 Ill., 263, as follows: "It was held in The People *ex rel* v. Warfield, 20 Ill., 160, that to give this provision of the Constitution a practical operation we must presume that it was the intention of the framers of that instrument that the voters would all vote, and that the majority of those *voting* should determine the question.

"To give it a different construction would involve an inquiry whether there were other voters of the county who had, from any cause abstained from voting; and this would lead to interminable inquiry and invite contests in such elections which would be embarrassing and baneful, if it did not destroy all the practical benefits of laws passed under these provisions of the Constitution. . . . "

But we are met with a very different question when the question is required to be submitted at a general election

is one of the purposes for which that election is held, and is required to receive the assent of two-thirds of the voters of the city voting at that election.

In such case the result depends on a majority of all the votes cast at the election being cast for the proposition, and not merely a majority of the votes cast on the particular question.

In the case of People v. Wiant, 48 Ill., 263, the Constitution required that a majority of the voters should vote in favor of the removal of a county seat, and the court held, referring to the case in 20 Ill., 160 :

"In Warfield's case there was no vote taken at that election, except upon the question of the removal of the county seat, and that vote was adopted as the means of ascertaining the number of legal voters of the county, and whether the majority was in favor of or against removal. In this case, however, there was at the same time an election held for circuit judge, which was a regular election. We, therefore, have in this case additional means of ascertaining the whole number of voters of the county. If the return of the various poll books of the county showed a larger number of votes cast for circuit judge or other officer than were cast for and against removal of the county seat, then that should be taken as the number of voters of the county; and it should appear that a majority of the voters at that election had cast their votes in favor of removal before the county seat could be changed. It is not the vote cast upon that single question that is to govern, where it appears that any other election was held at the same time, but it must appear that a majority of all the votes cast at that election were in favor of removal. When there is no other election held at that time the returns of the officers of votes on that question will govern."

Belknap v. City of Louisville et al.

So in People v. Brown, 11 Ill., 478, a case of mandamus to
compel township organization under a constitutional provi-
sion that "the General Assembly shall provide by general
law for a township organization . . . . whenever a majority
of the voters of such county at any general election shall so
determine," the court said:  "The language is clear and ex-
plicit and admits of but one meaning.   It does not mean a
majority of those voting on the question to be submitted,
but a majority of all the legal voters in the county."

In Everett v. Smith, 22 Minn., 53, the Constitution provided
that the question should be "submitted to the electors of the
county at the next general election after the passage there-
of, and be adopted by a majority of such electors," and it was
held that the provision required a majority of the electors
voting at the election and not a majority of those voting on
the question.

So in Ohio (25 Ohio State, 618), the legislature had author-
ized the levy of a tax, with this proviso:     That the levy
should not be made "until a majority of the electors of said
township at some regular election shall vote in favor of said
levy," and it was held that a majority of all the votes cast
at the regular election was required, and not a majority of
those voting on the question.

And in 47 Ohio State (6 L. R. A., 422), Ohio v. Foraker, a
provision of the Constitution that  . . . "if a majority of
the electors voting at such election shall adopt such amend-
ments the same shall become a part of the Constitution" was
held not to be complied with by a majority of the votes cast
on the amendment.

The Ohio Constitution had another provision requiring
the adoption of amendments which had been agreed upon
by conventions "by a majority of those voting thereon," and

the court called attention to the difference in language, say-
ing that "if the framers had had the same intention in fram-
ing section 1 as in framing section 3 as to how the majority for
the adoption of an amendment should be ascertained they
would have provided in that section as in section 3 that it
should be a majority of those voting thereon instead of a ma-
jority of the electors voting at such election."

This is directly in point in the consideration of
the case at bar, for in section 256 of the Ken-
tucky Constitution we find it provided that the
passage of an amendment to the Constitution shall be
determined by *"a majority of the votes cast for and against an
amendment;"* and in section 64 it is provided that no county
shall be divided, etc., "unless the majority of all the legal
voters of the county *voting on the question* shall vote for the
same." So that, in two other sections of the instrument,
the convention was at no loss for apt words with which to
limit the decision to the determination of those only who
should vote *upon the question.*

In State v. Lancaster, 6 Neb., 474, the Constitution pro-
vided for a township organization, "whenever the majority
of the legal voters of such county, voting at any *general elec-
tion,* shall so determine;" and it was held that as the affirma-
tive vote on the question submitted was less than a majority
of those voting at the election the proposition was defeated.

In State v. Winkelmeier, 35 Mo., 103, authority was
claimed under a legislative grant of power "whenever a ma-
jority of the legal voters" authorized the same, and the ma-
jority of those voting on the question were in favor of the
grant; but the court said: "It is evident that a vote of 5,000
out of 13,000 is not the vote of a majority."

The case of Hogg v. Baker 17 Ky. Law Rep., 577, was un-

Belknap v. City of Louisville et al.

der section 64 of the Constitution as to the removal of a county seat, which requires two-thirds *of those voting* to decide. That case, however, was decided largely on the ground that the voters were misled, and nothing appears in the record of the case at bar to show that the voters of Louisville were misled, except as it may be argued inferentially from the language of the statute and the ordinance and the smallness of the vote cast upon the question.

Little weight can be given the argument drawn from the fact that at a general election candidates for various offices may be elected notwithstanding other candidates for other offices may have received more than twice as many votes. The statute of election provides that the person receiving the highest number of votes for any office shall be declared elected to that office, and the election is decided by a plurality of votes.

Moreover, it may well be considered that there is an essential difference between the action of electors in voting for a candidate for office and in assenting to the creation of a municipal debt. The former is the exercise of a political privilege, the mere selection of a person to perform officially duties which have been annexed to a particular office, and it is fair to presume that those who do not participate in the election consent to be governed by those who do; but the latter is the authorization of a contract by which the people of the locality incur obligations and bind their property to the payment of a debt; and it is natural to expect that the language used in relation to it will be different; that definite action will be required of a majority of the voters, and that it will be required that their assent thereto shall be *expressed*, and so we find it in the Constitution and the statute.

If the submission were permitted to be and were in fact

submitted at an election at which no votes were cast except upon the proposition, it might very well be concluded that the words "two-thirds of the voters of the city" meant two-thirds of those who see fit to exercise their privilege, and that the ballot box is the only test to be applied. (L. & N. R. Co. v. Davidson County, 1 Sneed, 637.)

In this case the test of the ballot box shows that only one-fifth of the voters who voted at the election gave their assent to the proposition.

There were many authorities cited on both sides of this question, but it would be unprofitable to review them in detail. A very interesting analysis of a large number of them is given in South Bend v. Lewis, 37 N. E., 986. It will be found that they have turned, in some cases, upon the settled policy of the Constitution which was under consideration, as in the case of Metcalfe v. Seattle, 25 Pacific Rep., 1010, which at first blush appears to be directly in point against the conclusion reached by this court.

In most of the cases the courts' conclusions were reached by considering not only the language of the provision in question, but all other relevant sections of the instrument, as well as its general intent. These differ in the different cases, and it is not surprising that the courts have apparently differed in the weight which they have attached to the arguments drawn from them. Several of the cases cited have been doubted or qualified in subsequent cases. One of them, Gillespie v. Palmer, 20 Wis., 544, much relied on by counsel for appellee, has since been referred to by the chief justice of the Wisconsin court as one of a number of cases "which have long been a reproach to the court, as judgments proceeding upon policy rather than upon principle." (Bound v. Wisconsin Central R., 45 Wis., 543.)

In all of the cases the object sought was the intent of the instrument.

In the case at bar not much consideration has been given to the debates of the convention, though the members who spoke appear to have given section 157 the same construction with this court: "For, as the Constitution does not derive its force from the convention which framed but from the people who ratified it, the intent to be arrived at is that of the people; and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." (Cooley's Const. Lim., pp. 80-1, 6th ed.)

"Its terms must be taken in the ordinary and common acceptation because they have been so understood by the framers *and the people* who adopted it." (6 Neb., 474.)

These considerations have led us to reject the construction contended for by appellees, of which it may be said, in the language of the Ohio court in State v. Foraker, 6 L. R. A., 422: "But one of the most obvious objections to this construction is that it requires to be demonstrated by such a labored process of occult reasoning upon the meaning of words and phrases so different from the apparent meaning as to warrant the belief that it never occurred either to the framers of the Constitution or to the people who adopted it."

And in this case we can not believe that any considerable number of the voters who read section 157 of the Constitution before voting for its adoption thought for a moment that that provision upon its face restrictive of the power to create additional indebtedness could be so construed as to

authorize the creation of a million dollar debt upon the vote of some six thousand out of some thirty odd thousand voters actually at the polls.

We are not unmindful of the need for parks in a great city, and the benefits of a park system such as the one proposed and in fact instituted in the city of Louisville, but the people who are to bear the burden must give their assent to the creation of the debt to be incurred for that purpose.

There is another ground upon which this conclusion might be rested. The constitutional provision is restrictive. It forbids the creation of the debt unless upon the assent of two-thirds of the voters, etc. Had section 157 provided, as in section 64, that it should not be authorized unless two-thirds of the voters of the city *"voting on the question* shall vote for the same," that would not have required the legislature to authorize the submission of the question, nor the city authorities to submit it. So as the right to submit might have been denied altogether, it might be given with additional restrictions, as the requirement of a three-fourths vote; and when the city council by ordinance provided for the submission to the vote of the people, it might have imposed an increased restriction; so that if we were of opinion that the Constitution required only two-thirds of those *voting on the question*, we must still look to the act and the ordinance to find if they, or either of them, require any additional prerequisite to the bond issue. The statute is as follows:

"Section 2854. For the purpose of raising money for the purchase or improvement of lands for park property the general council of a city may, by ordinances, submit to the qualified voters of the city the question as to whether the city shall issue bonds, without interest coupons attached, to

the amount and of the character set forth in such ordinances; and when such ordinance is passed it shall, at the next November election, be submitted to the qualified voters of the city; and if it receives assent of two-thirds of those voting the bonds so voted shall be issued by the city and delivered to the board of park commissioners."

This requires the proposition to be submitted at the November election to the qualified voters of the city, "and if it receives the assent of two-thirds of those voting the bonds so voted shall be issued," etc. What is meant by those voting? Clearly those voting at the November election.

The ordinance is still more explicit. It provides:

"Section 5. At the November election of 1894 there shall be submitted to the qualified voters of the city of Louisville the question as to whether the city shall issue said bonds, and the said bonds shall not be issued unless at said election two-thirds of those voting shall vote in favor of the issuing of said bonds, as herein provided. In the event that two-thirds of those voting at said election shall vote in favor of issuing said bonds, then the fact that they have done so shall be certified to by the mayor upon said bonds, and the said bonds shall then, but only in that event, be issued by the city and delivered by the mayor to the board of park commissioners of the city of Louisville, to be by the said board of park commissioners used and disposed of for the improvement of lands for park property as provided by law."

This requires the submission at the November election of 1894, and provides that the bonds shall not be issued *"unless at said election (i. e.,* the November, 1894, election) two-thirds of those voting shall vote in favor of issuing said bonds. In the event that two-thirds of those *voting at said election* (the November election), shall vote in favor of issuing," etc

It is obvious that both the statute and the ordinance require the favorable vote of two-thirds of those voting at the general election.

Judge Landes dissents from that part of this opinion which holds that questions submitted to the people must be submitted at the regular election, being of opinion that the provision in section 157, requiring the assent of two-thirds of the voters "voting at an election to be held for that purpose," requires that there shall be a special election *held* "for that purpose," and that such special election can not be held on the regular election day, the words quoted being a mandatory *provision otherwise* within the meaning of section 148. Judge Landes concurs, however, in the other principles stated in the opinion.

The other questions raised in the record need not be considered.

For the reasons given the judgment is reversed with directions to sustain the demurrer to the first paragraph of the answer and for further proceedings consistent with this opinion.