Montgomery County Fiscal Court v. Trimble.

CASE 83—INJUNCTION—NOVEMBER 2.

# Montgomery County Fiscal Court v. Trimble.

APPEAL FROM MONTGOMERY CIRCUIT COURT.

ELECTIONS FOR FREE TURNPIKES—TWO-THIRDS MAJORITY VOTING ON THE PROPOSITION.—In an election held to determine the question of issuing bonds in aid of free turnpikes under the act of March 17, 1896, it is sufficient to carry the proposition that a majority of two-thirds of the electors voting on the subject should have voted for it, regardless of the number of votes cast for other purposes at that election. (Belknap v. City of Louisville, 99 Ky., 474; McGoodwin v. City of Franklin, 18 Ky. Law Rep., 752; and City of Owensboro v. Barker, same, 324, overruled.)

C. C. TURNER AND A. A. HAZELRIGG FOR APPELLANT.

The principle declared in the Belknap case (99 Ky., 474) should be overruled. Constitution, secs. 157, 148; F. Tr. & S. V. Co. v. City of Morganfield, 96 Ky., 563.

KENNEDY & WILLIAMSON, ALSO FOR APPELLANT.

Points and citations identical with those made in Maysville & Lexington T. P. Co. v. Wiggins, reported in this volume, p. 540.

G. E. COONS FOR APPELLEE.

(No brief on file.)

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

Under "An act to provide free turnpike and gravel roads," approved March 17, 1896, there was submitted, at the November election, 1897, to the voters of Montgomery county, the proposition as to whether or not they were in favor of issuing bonds for the purchase and maintenance of the turnpike roads of the county, free of toll to the traveling public. There were 1,920 votes cast for this

proposition, and 185 against it. At that election for county and State officers there were cast, in the aggregate, 3,060 votes. This action involves the construction of section 157 of the Constitution, which reads as follows: ". . . No county shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose. . . ."

There are two opposing views presented for our consideration. One is that it required two-thirds of all the votes cast at that election to give the fiscal court the right to issue bonds to purchase and maintain turnpike roads in the county, free of toll to the traveling public. The other is that when two-thirds of the voters voting on the proposition to issue bonds, etc., voted for it, the assent which the Constitution required had been obtained.

Section 157 of the Constitution does not make any reference to a general election. It limits the power of a city, town, county, and taxing district in the amount of taxes which shall be levied and collected, and prohibits them from becoming indebted in any year to an amount exceeding the income and revenue for such year, without the assent of two-thirds of the voters of such city, town, county, or taxing district, *voting at an election to be held for that purpose.* Previous to the present constitution, when a question was submitted to the voters as to whether a tax should be imposed or an indebtedness incurred, a majority of those voting on the question determined whether or not the tax should be levied or an indebtedness incurred. Indeed, the court can not recall an instance in which the assent of a greater number than a majority of those voting

Montgomery County Fiscal Court v. Trimble.

was required to be obtained to impose a tax or authorize an indebtedness to be contracted; neither can it recall an instance in which the General Assembly required a majority of the electors of a city, town, or county to give their assent to a proposition before taxes could be levied or an indebtedness incurred. It is a fundamental principle in our system of government that its affairs are controlled by the consent of the governed; and, to that end, it is regarded as just and wise that a majority of those who are interested sufficiently to assemble at places provided by law for the purpose shall, by the expression of their opinion, direct the manner in which its affairs shall be conducted. When majorities are spoken of, it is meant a majority of those who feel an interest in the government, and who have opinions and wishes as to how it shall be conducted, and have the courage to express them. It has not been the policy of our government, in order to ascertain the wishes of the people, to count those who do not take sufficient interest in its affairs to vote upon questions submitted to them. It is a majority of those who are alive and active, and express their opinion, who direct the affairs of the government; not those who are silent, and express no opinion, in the manner provided by law, if they have any. Before reaching a conclusion that those who framed our fundamental law intended to change a well-settled policy by allowing the voter who is silent and expresses no opinion on a public question to be counted the same as the one who takes an interest in and votes upon it, we should be satisfied that the language used clearly indicates such a purpose.

The constitutional convention thought it wise to require that the assent of two-thirds of those who voted upon the question of a municipality or a county incurring an in-

debtedness beyond its yearly income and revenue should be obtained. Partly for the purpose of taking from the general assembly the power to authorize a majority to control in such matters, section 157 was incorporated in the constitution. It is nowhere said in this section that the assent of two-thirds of the electors of the county, or two-thirds of those who may vote for candidates to fill offices, must be obtained before the indebtedness can be incurred. The language used does not even suggest the idea that the assent of two-thirds of the electors must be obtained. Besides, we cannot believe that the constitutional convention intended that some tribunal should be established to ascertain the number of electors in a county, and then require the assent of two-thirds of them to a proposition for the county to incur an indebtedness. That would introduce a new rule in this state,—one which would require accurate information, which is almost impossible to obtain. If it had been intended that two-thirds of those who might vote for candidates to fill offices and on other questions should be obtained, some language would have been employed to have clearly expressed that idea. If it had said the county could not incur an indebtedness "without the assent of two-thirds of the electors thereof," we would understand that an elector's failure to vote was equivalent to voting against the proposition. If it had said "without the assent of two-thirds of the voters thereof," voting at an election, we would be of the opinion that, when the word *"election"* was used, it referred to the proposition upon which the vote was to be taken. To avoid the necessity of the court determining the meaning of the word *"election,"* as used, the constitutional convention added, immediately after the word "election," words as follows: "To be held for that purpose." So the lan-

guage used in the constitution is as follows, to-wit: "That the assent of two-thirds of the voters thereof, **voting** at an *election* to be held *for that purpose.*"

The consensus of judicial opinion is that, when an election is held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves, and those who, being present, abstain from voting, are considered as acquiescing in the result declared by a majority (here two-thirds) of those actually voting, even though, in point of fact, but a minority of those entitled to vote really do vote. The fact that the election was held for the purpose of obtaining the necessary assent of two-thirds of the voters to the proposition on the day of the general election to fill offices does not change the rule of interpretation, nor, if so required to be held, does it show a purpose to require the assent of two-thirds of those who vote for officers and on other questions at the election. To so interpret the language used is to disregard its plain import and the current of judicial decisions in this country. If it meant that the assent of two-thirds of those voting at the general election for officers and on other questions was necessary to authorize the county to incur an indebtedness, then it was unnecessary and improper to allow any one to vote "No" on the proposition who may have voted for officers at that election. The general assembly took the view expressed of the section of the constitution under consideration, because the act under which the election was held provides: "If two-thirds of the legal voters voting on said proposition vote in favor of the proposition, then said fiscal court shall issue bonds as provided herein."

The question in Armour Bros. Banking Co. v. Board of County Com'rs of Finney County, 41 Fed. Rep. 322, arose

under a statute authorizing the creation of an indebtedness provided the question was "submitted to a vote of the people at some general election, and if a majority of all the votes cast at the polls opened for that purpose shall be in favor of such assessment, then the debt may be created." The court said: "The only question involved is a construction of said section. Does it mean a majority of all the votes cast, or a majority of all the votes cast on that subject? There were 2,887 votes cast for county and state officers at said election, and only 1,527 on the matter of buying a farm and raising an assessment to pay for the same— 1,133 votes in favor, and 394 against. The defendant insists that, to justify the board of county commissioners in contracting the debt, it should have received a majority of all the votes cast at said election; while the plaintiff insists that only a majority of all the votes cast on that subject was required. The law says: 'Unless the amount of taxes to be assessed shall be submitted to a vote of the people at some general election, and a majority of all the votes cast at a poll opened for that purpose shall be in favor of such assessment.' The words 'a majority of all the votes cast' do not mean cast at a poll opened for the purpose of a general election, but cast for the purpose of such assessment, at a poll opened for that purpose. If the meaning had been otherwise, instead of saying 'at a poll opened for that purpose,' the words 'at said election,' after the word 'cast,' would have clearly expressed the meaning defendant contends for. It is probable the law contemplates a separate poll or ballot box, but undoubtedly the same poll could be used as was used for county and state officers. Reading the statute in this manner solves the problem. The following authorities amply support the conclusion that only a majority of the votes cast

on the subject of the assessment were required: Commissioners v. Winkley, 29 Kan. 36; State v. Echols, (Kan. Sup.) 20 Pac. Rep. 523; Cass Co. v. Johnston, 95 U. S. 369; Walker v. Oswald, 11 Atl. Rep. 711; Gillespie v. Palmer, 20 Wis. Wis. 544; Sanford v. Prentice, 28 Wis. 358."

In Metcalfe v. City of Seattle, 1 Wash. 301, [25 Pac. 1013,] the court had under consideration a question involving the construction of a provision of the constitution of the state authorizing a city to increase its indebtedness "upon the assent of *three-fifths* of the voters herein voting at an election to be held for that purpose." It said: "In response to the second question, we have not the least hesitation in answering that the three-fifths majority required to carry an election in favor of increasing municipal indebtedness is three-fifths of those persons who actually vote at the election, and not three-fifths of all those who may have the right to vote thereat. The language of the constitution is that no municipal corporation shall become indebted beyond one and one-half per cent of its taxable property 'without the assent of three-fifths of the voters therein voting at an election to be held for that purpose.' How could words be plainer? It is three-fifths of the voters voting, not of all persons who might vote, but may or may not do so. The word 'therein,' placed between 'voters' and 'voting,' merely qualifies the persons who might vote, not the body of voters who must vote to constitute a lawful majority. At certain elections many persons residing outside of the city have their voting places assigned within the city limits; but, at these particular elections, it is only the voters 'therein'—residing therein— who can vote. Perhaps a longer phrase might have served to remove all doubt from every mind, but to us the interpretation seems clear as it is."

In Walker v. Oswald, 68 Md. 150, [11 Atl. 712,] the statute authorized the selling of spirituous liquors in a county, provided "a majority of the voters of said county shall determine by their ballots in favor of the high license law." The court said: "It thus appears, and in fact it is conceded, that the number of votes cast in favor of the high license law was not equal to a majority of all the votes cast at the same election for the several candidates for congress, though the votes actually cast in favor of this law constituted a majority of all the votes polled on that particular subject. The single question, therefore, presented by this appeal, is whether, under these circumstances, the act became operative and effective; or, stated in other words, did the adoption of the act depend upon its receiving in its favor a majority of all the votes cast at that elction upon some other subject or subjects, or upon its receiving a majority of the votes cast specifically for and against its adoption? It has been settled, both in England and this country, by an almost, if not quite, unbroken current of judicial decisions from the time of Lord Mansfield to the present day, that, when an election is held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves, and those who, being present, abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting, even though, in point of fact, but a minority of those entitled to vote really do vote. * * * Conceding this to be true with respect to a special election held for the purpose of submitting a single question to the popular vote, it is insisted on the part of the appellant that a different principle should prevail in a case like this, where, at a general election, the measure, though receiving a majority

Montgomery County Fiscal Court v. Trimble.

of the votes cast on that subject, failed to receive a majority of the votes cast upon some other subject. Hence, as we have already stated, the sole ground upon which it is claimed that the act in question failed to become effective, is that at the general election when the subject was voted on, less than a majority of those who voted for the congressional candidates cast their ballots 'for high license law,' and not that a majority of those who voted on this subject did not vote in favor of it. This objection to the adoption of the act is founded exclusively upon the construction which is sought to be placed upon the words of the eighth section, 'a majority of the voters of said county,' taken in connection with the evidence furnished by the vote on the congressional canvass, that there were more votes in the county than the number who voted upon this measure. If this construction, which confines the language to what is alleged to be its literal import, without reference to the provisions of the preceding section, is to prevail, it would be, it seems to us, as applicable in the case of a special election where but one subject is submitted, as it is claimed that it is in the case of a general election, where several subjects or persons are to be voted for; the only difference between the two instances being in respect to the evidence which might be adduced to ascertain the actual number of the voters of the county. In regard to a general election, it is urged that the highest aggregate vote cast furnishes the evidence as to the number of the voters of the county. At a special election it is not improbable that only a minority of the voters, well known to be an unmistakable minority, may vote. This fact might be susceptible of proof—might be in reality self-evident. Yet in the latter instance those who absent themselves from the polls, and those who, being present,

abstain from voting, are regarded as assenting to the result declared by those who do vote. Upon what principle would it be incompetent to apply the same presumption to those who, though attending a general election and voting on other subjects, abstain from voting upon one particular matter like the act in question? The very concession that a minority may elect necessarily implies that there is a larger number of voters who do not vote, of whom that minority is merely a fraction. Hence, the admission that a majority of those entitled to vote did not vote does not preclude the minority who actually do vote from determining the result by their ballots."

In Commissioners of Marion Co. v. Winkley, 29 Kan. 40, the statute was to go into operation, and, "if a majority of the votes cast are for the bounty, they shall declare said law to be in full force and effect." The proposition was voted for on the same day the general election for township officers in the county was held. The court said: "The electors who were present at the polls at the called election, and, while voting for township officers, did not vote upon the bounty proposition, are presumed to assent to the expressed will of the majority of those voting thereon."

The conclusion we have reached, and the opinions from which we have quoted, are supported by State v. Barnes, 3 N. D. 319, [55 N. W. 883;] County of Cass v. Johnston, 95 U. S. 360; Carroll Co. v. Smith, 111 U. S. 565, [4 Sup. Ct. 539;] Gillespie v. Palmer, 20 Wis., 544; Holcomb v. Davis, 56 Ill. 413; Smith v. Proctor, 130 N. Y. 319, [29 N. E. 312.] We are of the opinion that, when two-thirds of those voting upon the proposition to issue bonds voted therefor, the fiscal court was authorized to issue them for the purpose of buying and maintaining free turnpikes, unless there is some other legal or constitutional objection thereto not

Montgomery County Fiscal Court v. Trimble.

raised in this case. The case of Belknap v. City of Louis-
ville, 99 Ky., 474, [36 S. W., 1118], is overruled in so far as
it is in conflict with this opinion. The cases of McGood-
win v. City of Franklin, 18 Ky. Law Rep., 752 [38 S. W.,
481], and City of Owensboro v. Baker, 18 Ky. Law Rep.,
324 [37 S. W., 1129], are overruled. The result in the Bel-
knap case would have been the same had the court taken
the view of section 157 which is herein expressed, because
of the terms of the act and ordinance under which the
election was held.

This question involves important public interests. The
rights of the voters to  determine, in the manner author-
ized by the Constitution, what indebtedness, if any, munic-
ipalities or counties shall incur, should be preserved. We
have been called upon to re-examine the question involved,
and, having reached a conclusion that the opinion hereto-
fore expressed as to section 157 is incorrect, we think it
proper to so adjudge. "When a question involving im-
portant public or private rights, extending through all
coming time, has been passed upon on a single occasion,
and which decision can in no just sense be said to have
been acquiesced in, it is not only the right, but the duty,
of the court,when properly called upon, to  re-examine the
questions involved, and again subject them to judicial
scrutiny. We are by no means unmindful of the salutary
tendency of the rule *stare decisis;* but at the same time we
can not be unmindful of the lessons furnished by our own
consciousness, as well as by judicial history, of the liabil-
ity to error and the advantages of review." Cooley,
Const. Lim. (5th ed.), note to page 65. The judgment is
reversed for proceedings consistent with this opinion.

Judge Guffy dissenting:

It will be seen from the record and opinion in this case:

That at the November election, 1897, the following proposition was submitted to the voters of Montgomery county, to-wit: "Are you in favor of issuing bonds for the purchase and maintenance of turnpikes of this county, free of toll to the traveling public?" On that proposition 1,920 voters voted "Yes," and 185 voted "No." That at said November election for county and State officers, and upon all questions to be then determined, there were cast 3,060 votes. It further appears that the appellee, Trimble, instituted an action in the Montgomery Circuit Court seeking an injunction to restrain the fiscal court of Montgomery county from issuing any of said bonds. A demurrer was filed to the petition, which was overruled by the court below, and the appellant prosecutes this appeal.

The majority opinion of the court reversed the judgment of the court below, and holds that the votes cast at said election authorized the fiscal court to issue the bonds, thus overruling the decision of this court in Belknap v. City of Louisville, 99 Ky., 474 [36 S. W., 1118], rendered June 13, 1896, as well as some other decisions which follow that case. It will be observed that the vote in question was taken while the decision *supra* was in full force, which, in effect, said to the voters of Montgomery county who attended the election that "you need not go to the trouble of voting on the bond question, for if you vote at the election at all, and refrain from voting on the bond issue, you will be counted against it." It seems to me that it can neither be law nor justice for this court to now adjudge that the bond proposition had been carried or authorized by the vote cast, when in fact, according to the solemn decision of this court, in full force at the time of the election, the proposition was unquestionably defeated. I recognize and fully indorse the proposition that

Montgomery County Fiscal Court v. Trimble.

all erroneous decisions, if any, which have been or may hereafter be rendered by this court, should be overruled. There can be no more reason for allowing an erroneous decision to stand than exists for the continuance of a statute which ought never to have been enacted.   But I am of the opinion that the case of Belknap v. City of Louisville correctly expounds or construes the Constitution of this State.   I am frank to say that some of the decisions of courts of other States may have sometimes construed constitutional provisions somewhat similar to the one under consideration to mean what the majority opinion in this case holds the meaning of our Constitution to be; but I fully indorse the expression used by this court in response to a petition for rehearing recently delivered in the case of Louisville & Nashville R. R. Co. v. Com. [47 S. W., 598], which in substance says that this court will construe for itself the true meaning of its own constitution and laws. Moreover, if we had adhered to the decision in the Belknap case, the other courts would probably have adopted our construction of the language under consideration.

It is a well-settled rule of construction of all constitutional provisions, as well as of statutes and contracts, that the circumstances and conditions surrounding the parties at the time are to be taken into consideration if there be any ambiguity as to the wording of such provisions, laws, or contracts.   It can hardly be denied that much wrong and oppression had resulted to the property holders of the State by reason of elections being authorized at which bonds and debts were allowed by vote to be imposed upon the citizens of different counties and taxing districts.   It is well known that the framers of our present Constitution were cognizant of these deplorable evils

[41]

and burdens, and in good faith attempted to prevent a rep-
etition of such wrongs. And it was the boast of the advo-
cates of the new Constitution that its provisions would
protect the people from the imposition of enormous bur-
dens imposed by the votes of the people for the benefit of
corporations, or those who were booming or promoting
so-called "improvements" for the public good; and it is my
opinion that the enormous majority given for the adoption
of the new Constitution was due more to reliance upon
such statements than to any other cause.

Section 179 of the Constitution seems to prohibit any
county, etc., from becoming a stockholder in any company,
association, or corporation, or to obtain or appropriate mo-
ney for, or to loan its credit to, any corporation, associa-
tion, or individual, except for the purpose of constructing
or maintaining bridges, turnpike roads, or gravel roads.
Section 157 of the Constitution fixes the tax rate of cities,
towns, and counties, and, after specific provisions in re-
gard thereto, provides as follows: "No county, city, town,
taxing district, or other municipality, shall be authorized
or permitted to become indebted, in any manner or for
any purpose, to an amount exceeding, in any year, the in-
come and revenue provided for such year, without the as-
sent of two-thirds of the voters thereof, voting at an elec-
tion to be held for that purpose; and any indebtedness
contracted in violation of this section shall be void. Nor
shall such contract be enforceable by the person with
whom made; nor shall such municipality ever be author-
ized to assume the same." When we consider the manifest
object of the Constitution, and viewing it in the light of
current history, it seems to me that the manifest inten-
tion as expressed in the foregoing section was to prohibit
a county from becoming indebted in any manner in excess

Montgomery County Fiscal Court v. Trimble.

of the revenue authorized by the section *supra*, without the consent of two-thirds of the voters thereof. The question then naturally occurs, how is that consent to be obtained? The answer of the Constitution is, "Voting at an election held for that purpose." It must be borne in mind that these bonds can not be authorized by the fiscal court except on one condition, and that condition is clearly and unequivocally expressed in the section *supra*, in the words, "without the assent of two-thirds of the voters." That assent can only, under the terms of the Constitution, be ascertained by the voters attending the election, and voting for such indebtedness. We have nothing to do with the question that might be suggested as to how the number of voters in the county should be ascertained. The burden is always on the party holding the affirmative to make out his case. It must be conceded that the court has no right to impose a debt upon the taxpayers without some authority, and the only authority given by the Constitution is by the consent of two-thirds of the voters thereof; and, by any fair rule of construction, the word "thereof" must, of necessity, mean the voters of the county upon whom these enormous burdens are intended to be imposed. Has it ever been held, in any case where the assent of a party was required to make valid a proposition or contract, that his failure to refuse or object was ever held to be equivalent to assent? It may be well to remark further, that the proposition submitted to the voters is unlimited; and it may be well argued that, under the majority opinion, the fiscal court may, without limit, issue bonds enough for the purchase and maintenance of the turnpike roads of this county, free from toll to the traveling public, although such bonds may amount to untold millions. It is true that section 158 of the Constitution

says: "The respective cities, towns, counties, taxing districts, and municipalities shall not be authorized or permitted to incur indebtedness to an amount, including existing indebtedness, in the aggregate exceeding the following named maximum percentages on the value of the taxable property there," etc. But it must be remembered that section 157 is an independent section, and is the only section which treats of the power of the people to authorize the creation of indebtedness by vote; and, as there is no limit to the indebtedness which may be authorized by the vote therein provided for, it is not an unreasonable conclusion that, if the proposition is adopted by the constitutional vote, there is in fact no limit as to the indebtedness thus authorized to be incurred. But, if this fact be not correct, it must necessarily follow that the fiscal court can from year to year issue bonds for the maximum amounts allowed by section 158 to accomplish the purpose indicated in the proposition submitted to the voters as aforesaid. The requirement of two-thirds of the voters of the county to signify their assent by voting for the indebtedness in question is in accord with the provisions of the Constitution of 1849 and 1850, which required the vote of the majority of all the voters of the State to vote for the calling of a convention to amend the Constitution in order that the convention shall be called; and in the present Constitution (section 256) we find that it is provided that the passage of an amendment to the Constitution shall be determined by the majority of the votes cast for and against the amendment; and in section 64 it is provided that no county shall be divided, etc., unless a majority of all the legal voters of the county voting on the question shall vote for the same. So, in two other sections of the Constitution, the convention was at no loss for apt

words with which to limit the decision of the question to those only who should vote upon the question.

I adhere fully to the construction given to section 157 in the case of Belknap v. City of Louisville, *supra*. It seems to me that the doctrine announced in the majority opinion will enable turnpike corporations, whose property becomes worthless, to, in many cases, unload the same upon the taxpayers of the county, and burden the present and succeeding generations with taxes, which will be of but little benefit to the great mass of property holders in such county. It is feared that great injustice will be the result of all elections held and determined under the principles announced in the majority opinion. It does not require much sagacity to see that at no distant day turnpike travel will be to a great extent superseded by electric cars; and if it be true, as contended by some, that such car tracks or lines can be legally established alongside of the turnpikes, the pikes would then be of but very little, if any, value to the public. Entertaining the views which I do in regard to the manifest meaning and intention of section 157 of the Constitution, I feel it my duty to enter this, my most earnest and respectful dissent, from the majority opinion in this case.

Judge DuRelle dissenting:

In addition to the reasons stated in the opinion in the case of Belknap v. City of Louisville, 99 Ky., 474 [36 S. W., 1118], there are some reasons for dissenting from the majority opinion herein which apply peculiarly to the case at bar.

It is said that there are numerous elections to be held at the coming election upon the question of issuing bonds to pay for turnpikes purchased in various counties of this

State, and that in order to prevent the people from being
misled by the opinion in the Belknap case into abstaining
from voting at such elections, upon the theory that a vote
not cast upon that question will be counted as a vote
against the issue of bonds, this case should be decided be-
fore the election. This very case presents a well-defined il-
lustration of such misleading. The law under which the
proposition was submitted to the vote now under consid-
eration was enacted shortly before the opinion in the Bel-
knap case was delivered. It gave a legislative construc-
tion to the constitutional provision, by providing specifi-
cally that a two-thirds majority of the votes cast for and
against the proposition was sufficient to authorize the
bond issue. The Belknap case followed, and gave notice
to the people that the legislative construction was unau-
thorized by the Constitution, and that a vote cast upon any
other question, or for any officer, and not cast upon the
proposition to issue bonds, would be counted against the
proposed bond issue. Shortly after that opinion had so
given notice to the people of Montgomery county, the elec-
tion now under consideration was held; and the people of
that county—if they are to be supposed at all to take
notice of the proceedings and decisions of this
court—were misled into believing that it was unnec-
essary to vote upon the bond issue in order to defeat it,
provided they voted at the general election. It is no an-
swer to this proposition to say that the equality of the vote
for free turnpikes and the vote in favor of the bond issue
shows that they were not misled; for it may well be consid-
ered that those who might have voted against free turnpikes
refrained from voting on that question because they knew
that the vote in favor of free turnpikes would be inopera-

tive if a sufficient number of them refrained from voting
on the proposition for the bond issue.

To say nothing of the doctrine of *stare decisis*, it may be
here stated that, in all the authority cited upon the other
side of this question, there is not a case which comes
squarely up to the question in this case, or presents the
same language given in section 157 of the Constitution,
forbidding the creation of indebtedness by any municipal-
ity "without the assent of two-thirds of the voters *thereof*,
voting at an election to be held for that purpose." I am
clearly of opinion that this provision was intended by the
framers of the Constitution, and so understood by the
citizens whose votes made it organic law, to place, not an
insurmountable, but a real and effective, obstacle in the
way of the creation of municipal indebtedness by the
method which used to be termed "sneaking a vote
through." The custom had grown into an abuse, under
the old Constitution, of holding such elections without any
one voting at them, except those personally interested in
the passage of the measure, and thereby saddling upon a
municipality an increase of debt without the assent of a
tithe of "the voters thereof." This, in my judgment, was
intended to be prevented by section 157; but the opinion of
the majority in this case renders that attempt abortive,
for there would be practically no more difficulty in a
vigorous and organized minority securing a two-thirds
majority of the votes cast for and against such a proposi-
tion than there was under the old system in securing a
bare majority.

It seems to me that the question of policy, whether the
bond issues which it is desired to carry through at the
coming election are wise or unwise, is a question with
which this court has nothing to do; but that the policy of

the Constitution, in interposing real and practical obstacles to the adoption of such measures as the one under consideration, is one which should specially appeal to the court.