RICE *v.* PALMER.

Opinion delivered April 23, 1906.

1. CONSTITUTIONAL AMENDMENT—ADOPTION.—The question whether an amendment to the Constitution has been adopted by the required majority is not concluded by the action of the Speaker in joint session of the two houses of the Legislature in declaring it adopted, followed by the Governor's proclamation to the same effect, but is a judicial question to be settled by the courts.   (Page 438.)

2. SAME—POWER OF SPEAKER TO DECLARE RESULT OF ELECTION.—Kirby's Digest, § 718, providing that "if it shall appear that a majority of the electors voting at such election adopt such amendment, then the Speaker shall declare such proposed amendment duly adopted by the people of Arkansas," only calls for a decision by the Speaker from the face of the returns, and does not deprive the courts of jurisdiction to determine whether any particular amendment has been adopted by the constitutional majority.   (Page 440.)

3. SAME—MAJORITY REQUIRED TO ADOPT.—Under Const. 1874, art. 19, § 22, providing that amendments to the Constitution shall be submitted to the electors of the State for approval or rejection at a general election for senators and representatives, and that "if a majority of the electors voting in such election adopt such amendments the same shall  become a part of the Constitution," the majority necessary to adopt an amendment must be a majority of the electors voting at a general election for senators and representatives, and not a mere majority of those voting on the subject of the amendment.   (Page 446.)

Appeal from Lincoln Circuit . Court; *Antonio B. Grace,* Judge; reversed.

R. R. Rice brought suit, under the usurpation statute (Kirby's Digest, c. 155), against Henry D. Palmer to recover possession.of the office of circuit clerk of Lincoln County.

The cause was tried before the circuit judge sitting as a jury, and these findings of facts were made, towit:

"That the plaintiff is a citizen of Lincoln County, Arkansas, and was on the 31st of October, 1904, eligible to the office of clerk of the circuit court of that county. That at the general election held in that county in September, 1902, the defendant, H. D. Palmer, was duly elected to the said office of circuit clerk. That he qualified as such on the 31st of October, 1902, entered upon the discharge of his duties as such, and has continued to hold such office from that time to this. That in the general elec-

tion held in said county in 1904 one B. A. Meroney was duly elected to the office for the ensuing term, and thereafter, but before he had received a commission or qualified, he departed this life. That on the 31st day of October, 1904, the Governor of the State, by commission of that date, appointed and commissioned the plaintiff to be the circuit clerk of the county during the term made vacant by the death of said Meroney. That said commission was duly received by the plaintiff, who gave bond as the law prescribes, which was presented to the judge of the county court of Lincoln County during the vacation of the court, and was by him approved. That plaintiff took and subscribed the oath prescribed in the Constitution, and thereupon demanded of the defendant that he surrender to plaintiff the office of circuit clerk, which defendant declined to do. That the Governor, in appointing the plaintiff to the office of clerk, assumed to act under and by virtue of the authority contained in Amendment No. 3 to the Constitution of the State of Arkansas; that said amendment was duly submitted to the qualified voters of the State at the general election in September, 1894; that the vote upon said amendment was duly submitted to the joint assembly of the two houses of the General Assembly of the State of Arkansas on January 17, 1895, when it was ascertained that there had been 43,446 votes in favor of the amendment and 40,207 against it; and thereupon the said amendment was declared by the Speaker of the House of Representatives, as presiding officer of the said joint assembly, to have been duly adopted by the people of Arkansas; and thereupon the said speaker caused a true copy of said amendment to be signed by the President of the Senate and himself, and attested by the secretary of the Senate and the Clerk of the House of Representatives, and to be filed in the office of the Secretary of State, there to remain as a record in said office; and thereupon the Governor published his proclamation in a newspaper of general circulation, announcing the ratification and adoption of said amendment. That the return made to the said joint assembly of the vote cast in said election in 1894, showed that there had been a total vote of 126,986 cast for the office of Governor."

And upon said finding of facts the court declares the law to be as follows:

"1. That there was a vacancy in the office of circuit clerk

of Lincoln County on the 31st of October, 1904, to be filled in the manner prescribed by law.

"2. That Amendment No. 3 to the Constitution of the State of Arkansas was not ratified and adopted by vote of the people at the general election in September, 1894, and is not a part of the Constitution of the State.

"3. That the defendant by virtue of his election and qualification as circuit clerk in 1902, and the subsequent death of B. A. Meroney before his qualification in 1904, is entitled to hold the office and perform the duties of same until his successor is elected in the manner provided by section 50, article 7, of the Constitution of this State."

Judgment was entered for defendant, and plaintiff appealed.

*Cantrell & Loughborough* and *Rose, Hemingway & Rose,* for appellant.

1. The finding of the joint session of the Legislature, being upon a political question, is final, and is not subject to review in the courts. Section 22, art. 19, Const., prescribes the essential steps for the valid adoption of an amendment. No provision exists in the Constitution specifying the details for submitting the amendment, and necessarily these matters were reserved for the Legislature to provide for. These details are found in Kirby's Digest, §§ 703, 718. A State constitution is not an enumeration of powers in the legislative department, but is a restriction of supreme legislative power. The Legislature can exercise all the power not expressly or impliedly prohibited by the Constitution. 1 Ark. 513; 15 Ark. 619; 31 Ark. 511; 26 Ark. 523; Cooley on Const. Lim. 205. The power, therefore, since there is no prohibition in the Constitution, existed in the Legislature to constitute a body to ascertain the result of an election for an amendment, and to make the finding of this body conclusive. Such an act does not invade the province of the judiciary. Cooley on Const. Lim. 110. The General Assembly is empowered to provide by law the mode of contesting elections in cases not specifically provided for in the Constitution. Sec. 24, art. 19, Const. Since it appears by sec. 51, art. 7, Const., that the framers of the Constitution intended that contests for the offices there enumerated should be taken to the courts, they must have intended

that in contests of other elections the Legislature should be su-
preme. It has been held that the Legislature might create a
special tribunal to hear election contests. 32 Ark. 533. See also
62 Mich. 466; 1 Met. (Ky.), 533; 15 Ohio St. 114; 531 Ohio St.
250. And the finding of that tribunal or person is conclusive.
22 Md. 170; 77 Ga. 544. See also 83 Ga. 180; 27 La. Am. 544;
84 N. C. 158; 86 N. C. 8; Cooley, Const. Lim. 75; 40 Atl. 740;
29 Ark. 173; 7 How. 1-7; 69 Ind. 505; 32 Me. 508. Having the
power to constitute a body to ascertain the result of an election
for an amendment, the Legislature has done so by the enactment
of sections 717 and 718, Kirby's Digest, and the result of the elec-
tion as announced by the joint assembly is conclusive. 78 Md.
152, and authorities *supra*.

2. The finding of the joint assembly can be reviewed, if at
all, only in a direct proceeding. The conclusions of canvassing
boards on the result of an election are not open to collateral at-
tack. 15 Cyc. 387; McCrary on Elections, § 316; Cooley, Const.
Lim. 938; 32 Tex. 243.

3. If the court holds that it is at liberty to inquire into
the number of votes cast at the election upon the amendment,
then it is submitted that the amendment received the number of
votes required by the Constitution. Sec. 22, art. 19, Const. If
the term "electors voting at such election" was intended by the
framers of the Constitution to refer to all who might appear at
the polls and vote on measures other than the amendment, then
the majority required is foreign to the spirit of our government
and to the spirit of the Constitution itself, as evidenced by its
other provisions. Electors present at an election and not voting
acquiesce in the election made by those who do vote. 2 Bur-
row, 1017; 16 Wall. 644. See also 20 Wis. 572; 130 N. Y. 319;
29 Kan. 36; 68 Md. 146; 5 N. D. 594; 20 Ore. 154; 22 Minn.
400; 20 N. Y. App. 53; 49 La. Ann. 442; 40 Atl. (N. J.) 740,
47 S. W. (Ky.) 773; 41 Fed. 322; 1 Wash. 303; 16 Wall. 644;
95 U. S. 360; 111 U. S. 565; 45 Ark. 400; 67 Ark. 591; 69 Ark.
336.

4. There was a vacancy in the office at the time appellant
was appointed, by reason of the death of Meroney, who had been
elected but had died before the time came to qualify. Appellee,
the former incumbent, had no title to the term, but only had au-

thority to hold over for the public convenience until the vacancy could be filled.   73 Pac. 582.

*Taylor & Jones,* for appellee.

1. The amendment was never legally adopted. Appellee contends that the framers of the Constitution intended by the provisions of sec. 22, art. 19 Const. 1874, that the adoption of a proposed amendment should be by a majority of the electors voting at a general election at which senators and representatives were to be chosen, and not by a mere majority of electors voting on the question of the amendment. *Knight* v. *Shelton,* 134 Fed. 423; 17 Neb. 188; 51 Neb. 801; 46 Ohio St. 677; 77 Miss. 545; 37 Wis. 524, criticising, if not overruling, 20 Wis. 544; 54 Mo. 392; 73 Mo. 435; 138 Mo. 187; 16 Minn. 249; 22 Minn. 53; 102 Cal. 298; 108 Mich. 693; 99 Ky. 475; 20 Ill. 160; 48 Ill. 263; 68 Ill. 132; 15 Kan. 500; 47 Pac. 259; 20 Ore. 154; 68 Md. 140. The importance of contemporaneous legislative and executive construction is recognized, but such construction, to influence courts, must have been uniform, and within a reasonable time of the enactment construed. Cooley on Const. Lim. (5 Ed.), 67; 105 U. S. 691, 695; 110 U. S. 219-21; 147 U. S. 661; 152 U. S. 384; 163 U. S. 331; 181 U. S. 283. In this State such construction has not been uniform. The State Board, composed of the Governor, Attorney General and Secretary of State, declared that the "First Fishback Amendment," which had received a majority of the votes cast on the question of the adoption of that amendment, but had failed of a majority of the votes cast in the general election of 1880, was not adopted. The only object of the subsequent enactment (Kirby's Digest, § 717) requiring the returns of the election to be made to the Secretary of State, and by him sent to the Speaker of the House of Representatives, was to enable the latter to determine from the returns of the election for the principal offices whether the vote cast in favor of an amendment was a majority of all votes cast at such election. The rule of *stare decisis* does not apply in this case. The validity of the amendment was not raised in 69 Ark. 336, nor that of amendment No. 2 in 67 Ark. 591. Courts seldom pass upon the validity of legislation unless the question is raised by the parties. 94 U. S. 645. By comparing the different clauses of the present

Constitution on the subject of elections and majorities with those of the Constitution of 1868 on the same subjects, it becomes clear that the framers of the present Constitution intended to establish a different rule for different elections.

2. The question as to whether or not an amendment to the Constitution has been legally adopted is judicial, and the action of the legislative and executive departments thereon is not conclusive upon the courts. 77 Miss. 545; 6 Am. & Eng. Enc. Law, 906; 11 Ark. 481; 4 Mo. 303; 56 N. J. L. 480; 8 Cyc. 728; 24 Ala. 100; 69 Ind. 505; 60 Iowa, 534; 29 Minn. 474; *Ib.* 555; 54 Wis. 318; James. Const. Conv. (4 Ed.), 617; 6 Am. & Eng. Enc. Law (2 Ed.), 1052; 3 Am. & Eng. Enc. Law, 671 and cases cited; 6 Cush. (Mass) 573; 14 R. I. 649.

3. There was no vacancy. "All officers shall continue in office after the expiration of their official terms until their successors are elected and qualified." Art. 5, sec. 19, Const.; 42 Ark. 398. A vacant office is an office without an incumbent; and it can make no difference whether the office be a new one or an old. 48 Ark. 89. The death of a person elected to an office before he qualifies does not create a vacancy where the Constitution provides that the incumbent shall hold the office for his term, and until the election and qualification of his successor. 14 L. R. A. 858. See also McCrary on Elec. (4 Ed.), § 349.

*R. R. Rice,* appellant, *per se.*

1. An incumbent in office is not entitled to hold beyond the duration of the term of his office unless the law grants the right to hold beyond the term fixed. The term of circuit clerk is limited to two years, with no hold-over privilege. Sec. 19, art. 7, Const. Before appellee could set up any right under sec. 5, art. 19, Const., two things must concur, (1) his official term must have expired, and (2) there must be a vacancy in the official term succeeding his. If there is a vacancy, he is continued in office for the public convenience until a successor is lawfully qualified, not as a matter of right, but of grace merely. This court has held that Amendment No. 3 applied to elective offices only. 72 Ark. 94. That in all cases where, prior to its adoption, vacancies were filled by special elections, subsequent to its adoption it was the duty of the Governor to appoint persons to fill such vacancies. 69 Ark. 336. *Ib.* 392. It was, therefore, the duty of

the Governor to appoint some one to fill the vacancy caused by the death of Meroney, since, if the amendment had never been adopted, a special election would have been necessary.

2.    The court is concluded by the doctrine of *stare decisis.* 69 Ark. 336; *Ib.* 392.

HILL, C. J.    This is a contest over the office of circuit clerk of Lincoln County, and calls for a decision as to whether Amendment No. 3, authorizing the Governor to fill vacancies by appointment, was legally adopted as part of the Constitution. Rice holds under an appointment made by the Governor; and against his claim to the office thereunder Palmer asserts, first, that Amendment No. 3 was not legally adopted, and, second, that there was no vacancy in the office, within the meaning of the law.    The view the court takes of the first question renders unnecessary a decision of the second.

The clause of the Constitution under question is section 22, art. 19, as follows:

"Either branch of the General Assembly at a regular session thereof may propose amendments to this Constitution, and, if the same be agreed to by a majority of all the members elected to each house, such proposed amendments shall be entered on the journals with the yeas and nays, and published in at least one newspaper in each county, where a newspaper is published, for six months immediately preceding the next general election for senators and representatives, at which time the same shall be submitted to the electors of the State for approval or rejection; and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution; but no more than three amendments shall be proposed or submitted at the same time.    They shall be so submitted as to enable the electors to vote on each amendment separately."

The county election commissioners are required to certify the vote on the amendment to the Secretary of State, and the Secretary of State is required to transmit these sealed returns to the Speaker of the House of Representatives at the time and in the same manner that the returns for Governor and other executive officers are required to be transmitted to the Speaker. Kirby's Digest, § 716.    The Speaker is required, during the first week of the session, in the presence of both Houses of the Gen-

eral Assembly, to open and publish the votes cast for Governor, Secretary of State, Treasurer, Auditor and Attorney General. and the person having the highest number of votes for each respective office shall be declared duly elected thereto, and the President of the Senate and Speaker of the House shall file a certificate with the Secretary of State, declaring what persons have been elected to the offices named. Kirby's Digest, § 2852.

On the occasion of the ascertainment and declaration of the vote for Governor and said other executive officers, the returns on the amendment "shall be opened and counted in the presence of the General Assembly in joint convention assembled." Kirby's Digest, § 717.

Then follows this provision: "If it shall appear that a majority of the electors voting at such election adopt such amendment, then the Speaker shall declare such proposed amendment duly adopted by the people of Arkansas." Then follow provisions for certificate to be filed with the Secretary of State, and for the Governor to make proclamation of the adoption of this amendment. Kirby's Digest, § 718.

The declaration of the Speaker as to the result of the vote for Governor, Secretary of State, Treasurer, Auditor and Attorney General is not necessarily the final conclusion, for a contest may be had thereafter, and it shall be settled by the joint vote of both Houses, in which joint meeting the President of the Senate shall preside. Kirby's Digest, § 2877.

There is no statutory provision for any tribunal to determine a contest over the result of the election on an amendment, and the section above quoted, requiring the Speaker to declare the result from the votes then before him, is the only method of ascertainment of the result prescribed by statute.

In the general election of 1899 Amendment No. 3 received 43,446 votes, and there were 40,207 votes against it, and there were 126,986 votes cast for governor.

The Speaker in joint session of the General Assembly of 1895, upon the votes aforesaid then before him, declared the amendment adopted; it was duly certified by the President of the Senate and Speaker, and proclamation made by the Governor. Two questions are involved: First, is the action of the Speaker, followed by the executive proclamation, the ultimate

decision of this question which the courts can not review because committed to the other departments of State to determine, or is it a judicial question not to be settled until settled rightly in a judicial court? Second. Does an amendment require a majority of all the votes cast in the election or a majority voting on the question?

First. It is strongly pressed upon the court that the General Assembly has delegated to the Speaker, as the servant and the mouthpiece of the joint session, the power to determine as to whether a constitutional amendment has been adopted; and that question is a political one, determined by a co-ordinate department of government, and the judiciary is precluded from entertaining it. This argument has often been made in similar cases to the courts, and it is found in many dissenting opinions, but, with possibly a few exceptions, it it not found in the prevailing opinion of any court of last resort. The authorities are practically uniform in holding that whether a constitutional amendment has been properly adopted according to the requirements of the existing constitution is a judicial question, and it is a paramount duty of the courts to pass upon it. An examination of some of the leading cases may be both interesting and profitable. This exact question came before the New Jersey Court of Errors and Appeals on writ of error from the Supreme Court. The law of New Jersey provided that the Governor should summon four or more members of the Senate to sit with him, and they should constitute a board of canvassers to canvass and estimate the vote given for and against a constitutional amendment which had been voted on, and the board was empowered to "determine and declare" which amendments were adopted, and to certify the same, and its certificate would make the amendment part of the organic law. After the board had decided that an amendment relating to lotteries and one relating to appointments to office were adopted, and one on woman's suffrage was rejected, citizens and taxpayers caused the question to get into the courts, and the final court said:

"The question naturally arising first in this case concerns the legitimate scope of our inquiry: Have we authority to consider and decide whether the determination of the board of State canvassers that the proposed amendment had been adopted was lawful, or did that determination, followed by the proclamation

of the Governor, preclude judicial cognizance of the subject?"
After stating the exact questions involved in regard to the
amendments and how the case arose in the Supreme Court (there
a court of general and original jurisdiction), the court continues:
"It thus becomes manifest that there was present in the Supreme
Court, and is now present in this court, every element tending
to maintain jurisdiction over the subject-matter, unless it be
true, as insisted, that the judicial department of the Government
has not the right to consider whether the legislative department
and its agencies have observed constitutional injunctions in
attempting to amend the Constitution, and to annul their acts
in case they have not done so. That such a proposition is not
true seems to be indicated by the whole history of jurisprudence
in this country." The court then goes into an interesting review
of the authorities, and then says: "The examination made sup-
ports the assertion of Chief Justice Day (of Iowa) that the
decisions, so far as they deal with the existence of the principle,
are not in conflict. The only case found in which the jurisdic-
tion of the court was denied is *Worman* v. *Hagan,* 78 Md. 152."
(The court then discusses this case, which will be referred to
later.) *State* v. *Bott,* 45 L. R. A. 251, 43 Atlantic Rep. 744.

In Mississippi a case arose as to the adoption of a constitu-
tional amendment, and the first question which arrested the
attention of the court was whether it was a judicial or a polit-
ical question. Chief Justice Whitfield, in a clear and positive
decision, puts at rest any doubts on the question. He reviews
the decided cases on the subject, and says it is settled by an over-
whelming weight of authority that this is a judicial question; and
then he continues:

"The true view is that the Constitution, the organic law of
the land, is paramount and supreme over Governor, Legislature
and courts. When it prescribes the exact method in which an
amendment should be submitted, and prescribes positively the
majority necessary to its adoption, these are constitutional di-
rections mandatory on all the departments of government, and
without strict compliance with which no amendment can be
validly adopted. Whether an amendment has been validly
submitted or validly adopted depends upon the fact of com-
pliance or non-compliance with the constitutional directions as to

how such amendment shall be submitted and adopted, and whether such compliance has in fact been had, must, in the nature of the case, be a judicial question." *State* v. *Powell,* 77 Miss. 545, 48 L. R. A. 652.

In the case of *Koehler* v. *Hill,* 60 Ia. 545, a very exhaustive examination of this question was had. There was a majority and minority opinion, and then on motion for rehearing this question was threshed over. Chief Justice Day delivered a vigorous opinion, overruling the motion for rehearing. He reviewed the adjudged cases fully, and concluded his opinion on this branch of the case as follows:

"We have then seven States, Alabama, Missouri, Kansas, Michigan, North Carolina, Wisconsin and Indiana, in which the jurisdiction of the courts over the adoption of an amendment to a constitution has been recognized and asserted. In no decision, either State or Federal, has this jurisdiction been denied. We may securely rest our jurisdiction upon the authority of these cases. He would be a bold jurist, indeed, who would ride roughshod over such an unbroken current of judicial authority, so fortified in principle, sustained by reason, and so necessary to the peaceful administration of the government."

The Alabama court said:

"The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It is said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required or the requisitions enjoined, if the Legislature or any other department of the government can dispense with them? To do so would be to violate the instrument they are sworn to support; and every principle of public law and sound constitutional policy requires the court to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law." *Collier* v. *Frierson,* 24 Ala. 108.

The following States in the following cases have entertained jurisdiction of suits to determine the validity of the adoption of constitutional amendments, and treated such questions as judicial questions: Missouri, *State* v. *McBride,* 4 Mo. 303; North Carolina, *University of N. C.* v. *McIver,* 72 N. C. 76;

·Michigan, *Westinghausen* v. *People,* 44 Mich. 265; Indiana, *State* v. *Swift,* 69 Ind. 505; Wisconsin, *State* v. *Timme,* 54 Wis. 318; California, *Oakland Paving Co.* v. *Hilton,* 69 Cal. 479; Kansas, *Prohibitory Amendment Cases,* 24 Kan. 700; Minnesota, *Secombe* v. *Kittelson,* 29 Minn. 555; New Jersey, *State* v. *Wurts,* 45 L. R. A. 251, s. c. 43 Atl. Rep. 244; Alabama, *Collier* v. *Frierson,* 24 Ala. 108; Iowa, *Koehler* v. *Hill,* 60 Ia. 543; Mississippi, *State* v. *Powell,* 77 Miss. 545. And against this array of authorities is only the Maryland court in *Worman* v. *Hagan,* 78 Md. 152.

The strength of appellant's contention is in the argument that the General Assembly delegated to the Speaker, as the presiding officer of the joint session, the determination of this question. Chief Justice Whitfield said in *State* v. ·*Powell, supra,* "It may be that where the Constitution creates a special tribunal, and confides to that tribunal the exclusive power to canvass votes and declare the result, and make the amendment part of the Constitution, as a result of such declaration, by proclamation, or otherwise prescribed method fixed for such tribunal by the Constitution, then the action of the special tribunal would be final and conclusive, whether its action be judicial or not. This is so because it was competent for the sovereign people, speaking through their Constitution, so to provide."

It will be noted that Chief Justice WHITFIELD limits the exception to constitutionally created tribunals, but other courts recognize statutory tribunals as possessing the same power of ultimate conclusion · where the Legislature expressly provided. Judge Cooley thus expressed it in an analogous proposition:

"As the election officers perform for the most part ministerial functions only, their returns, and certificates of election which are issued upon them, are not conclusive in favor of the officers who would thereby appear to be chosen, but the final decision must rest with the courts. This is the general rule, and the exceptions are those cases where the law under which the canvass is made declares the decision conclusive, or where a special statutory board is established with power of final decision." Cooley, Const. Lim. p. 937.

In view of this exception to the rule of judicial review, which has in a few instances been applied to adoption of constitutional amendments, it is important to consider whether sec-

tion 718, Kirby's Digest, can be construed as creating the Speaker, either individually or as the representative of the joint session, a tribunal to determine the result of the election on amendments.

It is true that he must make declaration of the apparent result from the votes before him, just as he makes declaration of the election of governor and other officers from the votes before him. In the event of contest over one of the executive offices it is expressly provided that the joint session at a meeting presided over by the President of the Senate shall determine it, thereby showing clearly that there is no finality to this declaration from the face of the returns. Must it be taken, because there is no express provision for the joint session or other tribunal to determine a contest over an election on the amendment, that the only determination of it shall be the *prima facie* one from the face of the returns before the Speaker?

Suppose a few votes determine the fate of an amendment, and the returns from one county are known to be indubitably stained with fraud, and the proof is at hand. The Speaker is powerless to do more than declare the result as it appears from these returns sent him by the Secretary of State, who hands them to him as received from the county boards. Is it to be thought for a moment that it was ever intended that this perfunctory duty of the Speaker, limited to the face of the returns, should preclude inquiry and permit the organic law to be changed contrary to the expressed wishes of a majority of the people? Can it be possible that the lawmakers intended the organic law to be changed on the face of the returns, and yet no officer, from Governor to constable, is necessarily concluded by the face of the returns? The statement of the position carries its own refutation. Certainly no such intention can be imported into the legislation which imposed this formal duty on the Speaker, as the words of the act negative the thought of a final decision of the question by the Speaker. "If it shall appear that a majority," etc., is the language employed.

The Century Dictionary gives six definitions of the word "appear," comprehending all shades of meaning attached to it, and none of them convey the idea of judicial or final determination or decision, but all convey the thought of the surface, the apparent, the obvious, that which is to be seen at first sight. The

use of this word in defining the duties of the Speaker in this regard was quite apt, and properly imposed the formal and ministerial functions of casting up and declaring in open session what would appear to be the result. The votes on the principal State offices were then before him, and from these he could reach, at least approximately, the votes in the election, and the votes on the amendment would give the other necessary data to a *prima facie* decision from the face of the returns, and, in the language of Judge Cooley, "the final decision must rest with the courts."

The strongest case cited by appellant is *State v. Wurts*, 40 Atl. Rep. 740, but this was not the final decision of that case, and while the judgment was affirmed the ultimate conclusion on this question was different in the court of last resort, the gist of which has been given. *Worman v. Hagan*, 78 Md. 152, s. c. 21 L. R. A. 716, seems to support the appellant, although Chief Justice Whitfield in *State v. Powell, supra*, treats this case as one where a constitutionally created special tribunal took it out of the general rule, and does not regard it as antagonistic in principle with the other cases. While it is possible for that distinction to be made and save it from being an exception, yet the Maryland court itself did not make that distinction, and this appears to be merely a case out of plumb.

*Luther v. Borden*, 7 How. 1, is relied upon by counsel here, as it has been by counsel on the losing side in most of the other cases. There is a statement in the body of the opinion to this effect: that in forming the Constitution of the various States, and in the various changes and alterations which have since been made, the political department has always determined whether the proposed constitution or amendment was ratified or not by the people, and the judical power has followed the decision. This was not a point decided in the case, and the statement was made merely in the course of the argument leading to the points decided. The case grew out of "Dorr's Rebellion" in Rhode Island. The question was not as to an amendment of the Constitution, nor as to the adoption of the "Dorr Constitution," but was that where there were two opposing governments in a State, the determination of which was the legitimate government was a political, and not a judicial, question, and where the courts of the

State decide which was the proper government under its own laws, the Federal courts must follow the State decision. That this case, notwithstanding some general language, is not an authority for appellant is obvious; but if any doubt remains on the subject, the analysis of the case by Chief Justice Day in *Koehler* v. *Hill, supra,* will remove it. There can be little doubt that the consensus of judicial opinion is that it is the absolute duty of the judiciary to determine whether the Constitution has been amended in the exact and precise manner required by the Constitution, unless perchance a special tribunal has been erected to determine this question; and even then many of the authorities hold that this tribunal can not be permitted to illegally amend the organic law. Therefore it is the duty of the court to decide the question on its merits.

Second. This brings a consideration of the question whether in fact the amendment was adopted as required by the Constitution. The Constitution provides how an amendment shall be passed through the General Assembly for submission to the people and for publication for at least six months "immediately preceding the next general election for senators and representatives, at which time the same shall be submitted to the electors of the State for approval or rejection; and if a majority of the electors voting in such election adopt such amendments, the same shall become a part of the Constitution." Art. 19, § 22.

"Such elections" evidently refers to the general election for senators and representatives. Any other construction would be straining the natural meaning of clear and proper English. The majority necessary to adopt it must be the majority of electors voting at the general election for senators and representatives, and not a mere majority voting on the subject of the amendment. The framers of the Constitution of 1874 used plain and simple English. They knew what they wanted, and what they did not want, and this, more than any other Constitution of the State, is full of details and explicit limitations. The time in which it was framed begot positiveness and strong convictions. This method of amending the Constitution by direct vote of the people is an adaptation to the American constitutional system of the initiative and referendum of the Swiss Republic. For a change there to be made in the organic law, it must secure a majority, not only

of all the citizens of the Republic, but of all the Cantons of the Republic. This system is common to many States, and the prevailing rule is to require a majority of all the voters in the election, and not a mere majority of those voting on the question. Of course, the framers of the Constitution could have provided for either method; there were precedents for either of them when that clause was written, but, having deliberately and clearly adopted the rule that it must be a majority of the electors voting in the election, instead of a majority voting on this question, it is only for the court to bow to the express terms of the Constitution. This language needs no extrinsic aids to discover its meaning, but the court is not without authority for this construction. Similar or almost similar language has been before the courts many times, and while there is some conflict in the decisions, still the conflict is more apparent than real, and arises more from difference in language employed than in principles of construction. The authorities on this subject are reviewed at length by Judge Trieber in *Knight* v. *Shledon,* 134 Fed. 423, and by Chief Justice Whitfield in *State* v. *Powell,* 77 Miss. 545. The case law is carefully gone over in these opinions, and it would be an idle task to repeat what has been so well done. These two decisions demonstrate that the great weight of authority sustains the construction reached by the court as above stated.

In view of the foregoing opinion, it necessarily follows that the conclusion is that Amendment No. 3 was not adopted, and therefore the Governor did not have authority to appoint Rice circuit clerk. This was the judgment of the circuit court, and it is affirmed.

Justices BATTLE and WOOD concur.

Mr. Justice RIDDICK concurs in the judgment; his reasons will be stated in an individual opinion.

Mr. Justice McCULLOCH dissents.

RIDDICK, J., (concurring.) The facts in this case are as follows: H. D. Palmer was at the general election in September, 1902, elected to the office of circuit clerk of Lincoln County. On the 21st day of October, 1902, he duly qualified and entered upon the duties of the office, and has continued to discharge the duties thereof up to this time. At the general election in September,

1904, B. A. Meroney was elected to the same office, but he died on the 6th day of October, 1904, before he received his commission and before he had qualified or entered upon the duties of the office. Afterwards on the 31st day of October, 1904, the Governor of the State appointed R. R. Rice to the office, and issued a commission to him as circuit clerk of Lincoln County. Palmer, who had possession of the office, claimed that he had the right to continue in office until his successor was elected and qualified, and refused to surrender it to the appointee of the Governor, and Rice brought this action in the circuit court to recover possession. The circuit court decided against Rice, and he appealed.

There are two questions presented by this appeal. (1) Whether Amendment No. 3 to the State Constitution, which authorizes the Governor to fill vacancies by appointment, was legally adopted. (2) If this amendment has been adopted, and is a part of the Constitution, whether there was any vacancy in the office of circuit clerk of Lincoln County that the Governor could fill by appointment.

1. As to the first question: The amendment was duly submitted at a general election. The returns on the election were sent to the Secretary of State in sealed envelopes, who presented them to the Speaker of the House of Representatives, by whom they were opened and counted in the presence of the General Assembly in joint convention assembled, and the result declared that the amendment had been duly adopted by the people of the State. This was a decision of the question by the duly constituted and proper tribunal, and I do not think we can go behind or question the correctness of that decision in this proceeding. But, as that matter has been fully discussed by Mr. Justice McCulloch, I shall not do more than say that I concur in his opinion, and in the conclusion that he has reached on that point. See Ex parte *Danley,* 24 Ark. 1.

If, however, as the majority of the judges have concluded, we are free to review this decision of the Speaker and the General Assembly, it seems to me that it was correct. There were polled 43,446 votes for the amendment to 40,207 against it. It thus received a clear majority of over three thousand votes cast on that question.

The section of the Constitution which directs how amend-

ments shall be adopted provides that the proposed amendment shall be published "for six months immediately preceding the next general election for senators and representatives, at which time the same shall be submitted to the electors of the State for approval or rejection; and if a majority of the electors voting at such election adopt such amendment, the same shall become a part of this Constitution." Const. 1874, art. 19, § 22.

Now, the words "if a majority of the electors voting at such election" may mean either a majority of the electors voting for senators and representatives, or they may mean a majority of all electors voting at that general election, whether for the amendment or for any of the candidates voted for at that election, or they may mean a majority only of the electors voting on the question of the adoption of the amendment. As we have stated, the amendment received a majority of over three thousand of the votes cast on that question. It is not shown how many votes were cast for senators and representatives. The only thing shown against the amendment is that the amendment did not receive a majority of the votes cast for Governor at that election. So, to hold this amendment invalid under the facts of this case, we must conclude that to adopt an amendment the Constitution requires that it shall receive the votes of a majority of all the electors voting at that election, whether for the amendment, or for senators and representatives, or for any of the numerous officers voted for at the general election. And this is what a majority of the court holds; and as the number of those voting for the amendment is not equal to a majority of those voting for Governor, the court holds that the amendment was not legally adopted. I dissent from this conclusion.

If the framers of the Constitution intended that, in order to adopt an amendment, there should be a majority, not only of those voting for the amendment, but of all who voted at the election, whether for senators, representatives or other officers, it seems to me they would have used language which would have put the matter beyond question. The usual rule, when an officer is to be elected or a question is to be settled by a majority vote, is to consider only those votes cast for that office or on the particular question to be decided. All voters who absent themselves, or who, being present,

do not vote on the question, are presumed to assent that the matter may be decided by the majority of those voting unless the law under which the election is held clearly shows to the contrary. *Vance* v. *Austelle,* 45 Ark. 400; *Carroll County* v. *Smith,* 111 U. S. 556; *Cass County* v. *Johnson,* 95 U. S. 360; 15 Cyc. 388; 10 Am. & Eng. Enc. Law (2 Ed.), 754.

This principle, it seems to me, applies not only when the question is submitted at a special election, but also where the law requires it to be decided by a majority vote at a general election. The object in requiring the submission to be made at a general election is that at such an election more of the electors will attend and vote, and thus a fuller expression of the opinion of the electors will be secured. But if, after attending, any of them choose to vote for certain candidates, and not to vote for or against the amendment, it should be presumed that they assented to the decision of the majority who did vote thereon. Their failure to vote should not be allowed to defeat the will of those who do vote, unless the meaning of the Constitution to that effect is clear. *Vance* v. *Austelle,* 45 Ark. 400; *Rex* v. *Foxcraft,* 2 Burrow, (Eng.), 1017; *Walker* v. *Oswald,* 68 Md. 146; *Montgomery County Fiscal Court* v. *Trimble,* 104 Ky. 629; *Gillespie* v. *Palmer* 20 Wis. 572.*

In discussing a question of this kind in a recent case the Court of Appeals of Kentucky said: "It is a fundamental principle in our system of government that its affairs are controlled by the consent of the governed; and to that end it is regarded as just and wise that a majority of those who are interested sufficiently to assemble at places provided by law for the purpose shall, by the expression of their opinion, direct the manner in which its affairs shall be conducted. When majorities are spoken of, it is meant a majority of those who feel an interest in the government, and who have opinions and wishes as to how it shall be conducted, and have the courage to express them. It has not been the policy of our government, in order to ascertain the wishes of the people, to count those who do not take suffi-

---

*It is said in *State* v. *Powell,* 77 Miss. 583, that *Gillespie* v. *Palmer* had been overruled; but that seems to be an error. It was criticised in *Bond* v. *Railroad Co.,* 45 Wis. 579, but the judge who did so was writing a dissenting opinion, and did not speak for the court.

cient interest in its affairs to vote upon questions submitted to them. * * * Before reaching a conclusion that those who framed our fundamental law intended to change a well-settled policy by allowing the voter who is silent and expresses no opinion on a public question to be counted the same as the one who takes an interest in and votes upon it, we should be satisfied that the language used clearly indicates such a purpose. *Montgomery County Fiscal Court* v. *Trimble,* 104 Ky. 629, s. c. 47 S. W. 773. The court in that case held that a majority of those voting on the question was sufficient, without regard to how many votes were cast for the various candidates voted for at that election. In doing so it overruled one or two earlier cases that had held to the contrary.

The simplest and most common way to submit a question for determination by popular vote is. to count only those who vote on that particular question. To require that a question submitted to a popular vote at a general election should be determined by the majority of the votes cast, not only for it, but for all of the varrious candidates voted for at that election, is such an inconvenient, awkward and unusual way of deciding questions by popular vote that we should not expect such a conception from the framers of our Constitution; much less should we expect that, having that idea, they would give not even a hint as to how the majority of all the electors voting at a general election for so many different offices, township, county, district and State, should be determined.

Certainly, no such construction should be adopted unless the language clearly shows that such was the intention. But it does not do so. If, leaving out all other considerations, we stick alone to a close technical meaning of the words used, they may be said to require a majority of all electors voting for senators and representatives. There would be something definite and tangible about such a rule, much more in consonance with the character of the framers of the Constitution, whom the majority of the court speak of as men of "positive and strong convictions," "fond of detail" and "explicit limitations" and users of "plain and simple English," than what the court holds that they intended. For the court, after having complimented those men in that way, proceeds to hold that they did a thing the very opposite of what one should

expect from men of that kind. We should expect of such men that they would require that the adoption of the amendment should be determined by the votes on that measure alone, either by a simple majority or by a two-thirds majority, if thought necessary, for that would be definite and certain, and would exclude any possibility of mistake. It is possible that men of that kind might make a majority of those voting for senators and representatives or for some other office the test, but it seems to me inconceivable that they should make the test a majority of all the votes cast for the numerous offices voted for at a general election, without giving any rule by which such majority could be determined. For that would be so general, inexplicit and impracticable that the Legislature would be compelled to provide some method by which such majority could be approximately determined. Surely men of "strong convictions," "fond of detail" and "explicit limitations" would not have left their work, on such a vital point, in a condition that it must at once be retouched by the legislative hand. Either the majority of the court are mistaken in the character of those framers of the Constitution, or they are mistaken in the meaning of their language. I think they are mistaken in the meaning intended to be conveyed.

As before stated, the simplest, most direct and the most common way to determine a question by popular vote is to consider only those who vote on that question. If there are others who do not vote, they, to quote the language of an old case by a great judge, should be held "to acquiesce in the election by those who do." Lord Mansfield in *Rex* v. *Foxcraft*, 2 Burrow, 1017.

The natural presumption, where there is any doubt, should be that the makers of the Constitution intended to follow the usual rule, and to require for the adoption of an amendment a majority of those voting on that question. In my opinion, the words, "if a majority of the electors voting at such election adopt the amendment," refer to a majority voting on the question of the adoption of the Constitution. This language has been so construed by the Speaker and the General Assembly, not only when the returns on this amendment were before them, but as to the several other amendments that have been declared adopted. These amendments have for years been treated as valid parts of

the State Constitution. Appointments made by the Governor by virtue of this amendment have been received by the people of the State as valid, and have been recognized as such by this court. *Childers* v. *Duval,* 69 Ark. 336. Whether the decisions of the Speaker and the General Assembly on the adoption of these amendments is conclusive or not, they are certainly persuasive, and every reasonable doubt should now be resolved in their favor. When this rule is applied, it seems clear to me that this amendment should be sustained. I cite cases the reasoning of which tends more or less to support this view, though, this being a question concerning the meaning of our own Constitution, I attach no great weight to decisions from other States, for the language construed is seldom the same in all respects as that before us. *Vance* v. *Austelle,* 45 Ark. 400; *Childers* v. *Duval,* 69 Ark. 336; *County of Cass* v. *Johnson,* 95 U. S. 360; *Carroll County* v. *Smith,* 111 U. S. 556; *Walker* v. *Oswald,* 68 Md. 146; *Montgomery County Fiscal Court* v. *Trimble,* 104 Ky. 629; *Gillespie* v. *Palmer,* 20 Wis. 572; *State* v. *Longlie,* 5 North Dakota, 594; *State* v. *Grace,* 20 Ore. 154; *Smith* v. *Proctor,* 130 N. Y. 319; *Metcalfe* v. *Seattle,* 1 Wash. 303.

There are other cases to the same effect as these, and as many, probably more, cases to the contrary, one of the best considered and ablest being the decision in *Knight* v. *Shelton,* 134 Fed. 423, delivered by the United States Circuit Court for the Eastern District of this State. But for the reasons stated, I am unable to concur in the conclusion reached in that case and by the court in this case, for in my opinion only a majority of those voting on that question is necessary to adopt an amendment to our Constitution.

As I think that this amendment is now a valid part of our State Constitution, it follows that in my opinion the Governor has power to fill a vacancy in a county office by appointment, and I shall proceed to consider the question as to whether there was a vacancy in the office of circuit clerk of Lincoln County to be filled.

A vacancy in an office may be caused by the death, resignation or removal of the official holding the office, or by the creation of a new office. *Smith* v. *Askew,* 48 Ark. 89. "As a general rule, there is a vacancy in office whenever there is no incumbent

to discharge the duties of the office, that is whenever the office is empty or unfilled; but as long as there is any one authorized to discharge the duties of the office, the office is not to be deemed vacant so as to authorize the exercise of the power to fill vacancies in office." 23 Am. & Eng. Enc. Law (2 Ed.), 348, 349; *State* v. *Harrison,* 113 Ind. 434, 3 Am. St. Rep. 663; *People* **v.** *Edwards,* 93 Cal. 157; *Baxter* v. *Latimer,* 116 Mich. 356.

Now, our Constitution provides that "all officers shall continue in office after the expiration of their official terms until their successors are elected and qualified." Art. 5, § 19, Const. 1874. Meroney, who was elected to fill the office of circuit clerk as successor to Palmer, having died before the expiration of Palmer's term of office, and before he had taken the oath of office and qualified as such official, his death created no vacancy, for Palmer has, under the Constitution, the right to continue in office until his successor is both elected and qualified. If Meroney had been commissioned, and had qualified and entered upon the duties of the office, and then died, his death would have caused a vacancy in office. But he died before this. He had not been commissioned, and had not qualified, and held no office when he died, and, holding no office, his death created no vacancy. Palmer's right to the office, until his successor is elected and qualified, is as clear as that of any clerk in the State. As there was no vacancy in the office, the Governor had no right to appoint, and his appointment conferred nothing upon his appointee, Rice. The judgment of the circuit court in favor of Palmer was correct, and for the reasons stated I concur in the judgment of affirmance. Mr. Justice WOOD authorizes me to say that he also is of the opinion that there was no vacancy to be filled, and concurs in this opinion to that extent.

McCULLOCH, J., (dissenting.) I do not agree with the majority of the court in the conclusion reached in this case. I will not discuss the question as to the number of votes required by the Constitution to adopt the amendment, as it seems plain to me that the ascertainment of the result of the election made by the joint session of the Legislature, and its declaration, made through the Speaker of the House, of the adoption of the proposed amendment, are conclusive of that fact, and must be accepted by the courts as final.

I fully concur, however, in all that is said by Mr. Justice
RIDDICK in his separate opinion to the effect that the framers of
the Constitution meant to require, for the adoption of an amend-
ment, only the affirmative vote of a majority of all the electors
voting upon that question at the election.

The Constitution provides how amendments thereto may be
originated and submitted to the people for adoption, but it is silent
as to the method by which the result of elections upon the question
of adoption or rejection shall be ascertained and declared. At
least, there is no express provision of that instrument upon the
subject, except that they shall, at ·the next succeeding general
election for senators and representatives, "be submitted to the elec-
tors of the State for approval or rejection; and if a majority of
the electors voting at such election adopt such amendments, the
same shall become a part of this Constitution."

The nearest approach to an express provision of the Consti-
tution on the subject is found in a section of the same article
(sec. 24, art. 19) as follows:

"The General Assembly shall provide by law the mode of
contesting elections in cases not specifically provided for in this
Constitution."

But whether this be held to be authority for the Legislature
to provide a method of ascertaining, declaring and contesting
the result of an election upon the adoption or rejection of a pro-
posed amendment to the Constitution, certainly nothing is found
anywhere in that instrument restricting the power of the Legis-
lature in this regard.

According to the American system of government, the Con-
stitution of a State is not a grant or enumeration of powers
vested in the legislative department, but is a mere limitation upon
the exercise of such powers. The Legislature can exercise all
the powers not expressly or by fair implication prohibited by the
Constitution. "The Legislature," said Mr. Justice LACY in de-
livering the opinion of this court in *State* v. *Ashley,* 1 Ark. 511,
"then, can exercise all the power that is not expressly or impliedly
prohibited by the Constitution; for whatever powers are not lim-
ited or restricted, they inherently possess as a portion of the
sovereignty of the State." The same doctrine has been so often
announced that it has become elemental. I am not aware of it

ever having been controverted. *State* v. *Fairchild,* 15 Ark. 619; *Eason* v. *State,* 11 Ark. 481; *Baxter* v. *Brooks,* 29 Ark. 173; *Ruddell* v. *Childress,* 31 Ark. 511; *Dabbs* v. *State,* 39 Ark. 353; Cooley, Const. Lim. § 205.

Then, if it be held that the Legislature possesses the power to provide a method for ascertaining and declaring the result of an election upon the submission of a proposed amendment to the Constitution, it seems equally clear that the Legislature of the State has done so.

The statutes on the subject, after providing for the method of publication of the proposed amendments, the form of the ballots and duties of the judges of election with respect to certifying the returns, are as follows:

"Section 716. County election commissioners, at the same time and in the same manner that they are required to send the abstracts of election of senators and representatives in the General Assembly, shall send to the Secretary of State copies of the abstracts filed in their office of the returns of the vote on said amendment, plainly marked on the envelope thereof the words: 'Returns of vote on Amendment No...... From the county of ......' And in case of a failure to receive any returns of such vote at the seat of government for ten mails after the same is due, the Secretary of State shall dispatch a messenger to the county from which returns have not been received, with directions to bring up such returns or copies thereof.

"Sec. 717. When all the returns have been received by the Secretary of State, said Secretary shall keep such returns in the original envelopes with the seals unbroken until the General Assembly shall convene, when he shall send such returns to the Speaker of the House of Representatives at the same time and in the same manner as is now provided by law for sending in the election returns for Governor and other State officers, and said returns shall be opened and counted in the presence of the General Assembly in joint convention assembled.

"Sec. 718. If it shall appear that a majority of the electors voting at such election adopt such amendment, then the Speaker shall declare such proposed amendment duly adopted by the people of Arkansas. And when so declared adopted, the Speaker of the House of Representatives shall cause a true copy of such

amendment to the Constitution of the State of Arkansas; signed by the President and the Speaker of the House of Representatives, and attested by the Secretary of the Senate and the Clerk of the House of Representatives, to be filed in the office of the Secretary of State, and the same shall be and remain a record of said office. The Governor shall, thereupon, publish his proclamation in some newspaper of general circulation, announcing the ratification and adoption of said proposed amendment, and it shall have all the force and effect of any other part of the present Constitution, and shall be recognized by the legislative, executive and judicial departments of the State of Arkansas, from the filing of such certified copy in the office of the Secretary of State, as a part of the organic law of the State."

It appears that the provisions of the statute were complied with as to canvassing the returns and declaring the adoption of the amendment in question.

The record of the joint session of the two houses of the Legislature recites the following proceedings:

"The joint assembly then proceeded to open and canvass and publish the returns of the election held September 3, 1894, for Amendment No. 4, and against Amendment No. 4.

"The Speaker of the House declared the result of such election as appears from the returns so opened and published to be as follows:

"For Amendment No. 4, 42,426.

"Against Amendment No. 4, 40,207.

"And it appearing from the said returns that the majority of the electors voting at said election voted for said amendment, the Speaker of the House of Representatives declared the amendment adopted by the people of Arkansas."

That the statutes in question contemplate a final and conclusive determination of the result of the election and the adoption of the amendment, there can scarcely be a doubt.

They provide that when the Speaker declares the adoption of the amendment, and a duly attested copy thereof is filed in the office of the Secretary of State, the "Governor shall thereupon publish his proclamation in some newspaper of general circulation, announcing the ratification and adoption of said proposed amendment, and it shall have all the force and effect of any

other part of the present Constitution, and shall be recognized by the legislative, executive and judicial·departments of the State of Arkansas, from the filing of such certified copy in the office of the Secretary of State, as a part of the organic law of the State."

It is contended by those who deny the legal adoption of the amendment that the Speaker of the House of Representatives, in complying with the terms of the statute, only performs a ministerial duty in announcing the result of the election, and that no determination of the result is thereby recorded. The majority of the court are pleased to refer to the ascertainment and declaration of the result of the election as the act of the Speaker alone. I think this is entirely too narrow a scope to give to the statute. It is inconceivable to my mind that, if the framers of the statute intended to give no more force and effect to it than that, they would have provided for the useless ceremony of having both houses of the General Assembly convene in joint session in order to sit idly by and witness the performance of so perfunctory a duty. If the members of the two houses, representing as they do the sovereignty of the people, were to do no more than stand as silent witnesses to the ceremony, without power to protest against or correct a false or erroneous declaration of the result of the election, as well might the result be declared to bare walls instead of in the presence of the Assembly. As well might the returns be left with the Secretary of State to open them and declare the result, the same as he does with the returns of the election of certain State officers which are not required to be certified to the Speaker of the House of Representatives.

The Speaker is the mouthpiece, the creature and servant of the House, not its master in any sense or in the performance of any duty. He merely does the bidding of the House. And, according to all settled rules of statutory construction and of parliamentary law, if he should, in the performance of the duty imposed upon him by this statute, announce a result different from the will of the majority of the members of the joint session, that body would undoubtedly have the power to revise or reverse the ruling and correctly declare the result of the election. The joint session of the two houses also, in my opinion, has the power to hear and determine a contest as to the result of the election. It

is not essential that the word "contest" should have been used, if it may be fairly implied from the terms of the act that it was meant to give the joint session the power to ascertain and declare the correct result of the election. The power to hear and determine a contest for the purpose of ascertaining the correct result of the election would necessarily follow.

This court, in *Baxter* v. *Brooks,* 29 Ark. 173, in dealing with the power of the Legislature to hear contest for the office of Governor, said: "The mere failure on the part of the Legislature to provide a mode of conducting the trial would no more oust the jurisdiction than a failure to establish laws governing actions before justices of the peace or probate courts would destroy their constitutional jurisdiction, and give power to bestow it somewhere else by a simple enactment." 'In other words, the framers of the Constitution, by failing to expressly provide for a method of ascertaining and declaring the result of elections for the adoption of amendments, or for contesting the result by proceedings in the courts, have left it to the legislative branch of government for treatment as a political question, the same as the election of certain officers and contests thereof, and the same as the enactment of laws for the welfare of the people. Viewing the question in that light, the courts have nothing to do with it further than to decide whether or not amendments have been properly proposed and submitted to the people and the result of elections thereon determined and proclaimed by the proper legislative authority.

It is noteworthy, as indicative of the legislative intention in framing the statute in question, that the returns of an election upon the adoption or rejection of an amendment are required to be certified and delivered to the Speaker of the House of Representatives, the same as returns of the election of those State officers (Governor, Secretary of State, Treasurer, Auditor and Attorney General) contests of which the Constitution provides shall be before the General Assembly. This indicates an intention to provide a tribunal, not only for the ascertainment and declaration of the result, but also for a contest over a disputed result.

Much may be said, in support of this contention, of the expediency of a speedy and definite ascertainment of the result of such an election, so that the people at large, and especially

those who are charged with enforcement of the law, may be informed as to changes in the organic law and, knowing them, may obey its mandate. I can conceive of no more intolerable condition of public affairs that that of having the result of an election for the adoption or rejection of an amendment to the Constitution left in doubt until such time as the adjudication in the courts of personal rights shall demand a decision of the question. It is chaotic. For, so long as the question of fact whether or not a proposed amendment has received the approval of a majority of the voters remains unascertained by some final arbiter of that question, no man may with certainty know the law.

In the very nature of things, the courts can only adjudicate the validity of an amendment to the Constitution when it is drawn in question in suits involving private rights, and can then base a judgment only upon the facts proved and presented in the record of that particular case. No decision of the question in one case can ever become binding upon the court or parties in another case where the proof is different as to number of votes cast at the general election at which the proposed amendment has been submitted. Therefore the question can never be regarded as definitely settled if its settlement is a judicial question to be adjudicated by the courts. To illustrate: Amendment No. 5, known as the "Road Tax Amendment," received only a small majority of all the votes cast at the general election of September, 1898, at which it was submitted for adoption or rejection, if the total number of votes cast for the several candidates for Governor be taken as the test. According to the decision of the court, however, the vote for Governor does not necessarily afford the test, and it is always open to question the actual number of votes cast. Now, suppose that in a suit by one taxpayer to restrain the collection of the road tax assessed against his property, he should prove to the satisfaction of the court by proper certificates of the total number of votes cast for the various candidates for county officers that the vote for Governor did not represent the total vote cast at the election, and that the amendment did not receive a majority of all the votes cast at the election. The trial court would then declare that the amendment was not adopted, and that the assessment of road tax was void, and this court on appeal would of course affirm the decision. Let us suppose also

that another taxpayer should bring suit for the same purpose, but should be less diligent than the other successful litigant in getting proof of the total number of votes cast at the election, and content himself with the proof of the number of votes cast for candidates for Governor. The trial court would in that case declare the amendment to have been legally adopted, and enforce the payment of the tax, and this court would of course affirm the decision. We would then have presented the novel spectacle of this court declaring in one case the amendment legally adopted as a part of the organic law of the State, and in another case declaring it to have been rejected. Who, then, could know the law?

But it is said that this is necessarily a judicial question, to be settled by the courts. Why so? Haven't the people, in framing the Constitution of the State, the right to leave with the Legislature, as a political question, the power to provide a method of ascertaining and declaring the result of an election upon an amendment? It seems plain to me that in framing the Constitution of 1874 they have done so, and that the Legislature has provided a method of definitely and finally ascertaining the result of such election. I can see no reason, either as a matter of expediency or of law, why this could not be done, or, with due deference to the opinions of my brothers, how a conclusion can be reached that it has not been done.

Other questions of like import and equal importance have been left with the legislative branch of government for final decision, and this court has recognized the binding effect of the provision.

The Constitution of 1868 provided that the General Assembly should canvass the returns of the election of Governor, Secretary of State, Treasurer, Auditor and Attorney General, declare the result and hear contests for said offices, and this court has held that it is a valid provision for the final settlement of the result of such election as a political question.

No suggestion has ever been made that that is a judicial question which must be settled by the courts. On the contrary, this court has held that the courts can not review the decisions of the Legislature. *Baxter* v. *Brooks,* 29 Ark. 173. This decision sustained by the great weight of authority. *Taylor* v. *Beckham,* 108 Ky. 278; *Batten* v. *McGowan,* 1 Metc. 533; *State* v.

*Marlow,* 15 Ohio St. 134; *People* v. *Goodwin,* 22 Mich. 496.

The Constitution provides that no local or special bill shall be passed, unless notice of the intention to apply therefor shall have been published in the locality where the matter or the thing to be affected may be situated; but this court has repeatedly held that the question whether the notice has been given is one exclusively for the Legislature, and that the courts will not treat it as a judicial question, and review the action of the Legislature. *Davis* v. *Gaines,* 48 Ark. 370; *Waterman* v. *Hawkins,* 75 Ark. 120.

The Constitution also provides that "in all cases where a general law can be made applicable, no special law shall be enacted" by the General Assembly; but this court has often held that the question whether the desired result can be accomplished by a general act must be determined by the General Assembly, and that its determination is conclusive. *Boyd* v. *Bryant,* 35 Ark. 69; *Davis* v. *Gaines, supra; Carson* v. *Levee District,* 59 Ark. 513; *St. Louis S. W. Ry. Co.* v. *Grayson,* 72 Ark. 119; *Waterman* v. *Hawkins, supra.*

The court, in the case last cited, quoted with approval the following language from Judge COOLEY: "The moment a court ventures to substitute its own judgment for that of the Legislature in any case where the Constitution has vested the Legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference." Cooley's Const. Lim. (7 Ed.), p. 236.

The Constitution provides that no appropriation of money shall be made except for defraying the necessary expenses of government, and for certain other purposes named, without the concurrence of a majority of two-thirds of the General Assembly; yet this court held that the General Assembly must be the judge whether the object of an appropriation is for "necessary expenses of government," and that its determination is binding upon the courts. *State* v. *Sloan,* 66 Ark. 575; *State* v. *Moore,* 76 Ark. 197.

If these are not judicial questions to be determined by the courts alone, how can it properly be said that the result of an election upon the adoption or rejection of a proposed amendment to the Constitution is essentially a judicial question, which

must be determined by the court, even though the framers of the Constitution have seen fit not to restrict the power of the Legislature to provide a method of finally and conclusively ascertaining the result of such election?

It is not material whether the Constitution itself provides that the Legislature shall determine the result of the election, or whether, by silence upon the subject, and by failing to restrict the power of the Legislature in that respect, it has left that branch of government free to provide a method of ascertainment. The effect is the same, for, as we have already seen, the Legislature is vested with sovereign power, except as is expressly or by fair implication restricted by the Constitution. I think the views I have expressed are fully sustained by authority.

The following cases sustain the doctrine that where the Legislature, by authority of the Constitution, has erected a tribunal for the purpose of determining the result of an election upon any subject, the decision of such tribunal is conclusive, and can not be reviewed by the courts. *Govan* v. *Jackson*, 32 Ark. 553; *Batten* v. *McGowan*, 1 Metc. 533; *Taylor* v. *Beckham*, 108 Ky. 278; *Luther* v. *Borden*, 7 How. (U. S.) 1; *Taylor* v. *Beckham*, 178 U. S. 548; *State* v. *Harmon*, 31 Ohio St. 250; *Corbett* v. *McDaniel,* 77 Ga. 544; *Simpson* v. *Commissioners of Mecklenburg*, 84 N. C. 158; *Miles* v. *Bradford*, 22 Md. 170; *Worman* v. *Hagan*, 78 Md. 152.

The case of *Worman* v. *Hagan, supra,* is precisely in point, except that the Maryland Constitution provided that the returns of elections should be made to the Governor, and that he should ascertain and declare the result. The court said: "It will be seen that the Constitution confides to the Governor exclusively the power and duty of ascertaining the result of the vote from an examination of the returns made to him. And, on his proclamation that a proposed amendment has received a majority of the votes cast, it becomes *eo instanti* a part of the Constitution. There is no reference of the question to any other officer, or any other department. It is committed to the Governor without qualification or reserve, and without appeal to any other authority. Most certainly, no jurisdiction is conferred on this court to revise his decision. It may be asked what is to be done in case the Governor should violate his duty, and wrongfully proclaim an amendment

as adopted which in point of fact had been rejected. It would not be becoming in this court to suppose that such a contingency would ever happen. The courtesy due to the executive department forbids us to entertain such a conjecture. But, if, unhappily, in future times it should ever occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and repress offenses against its sovereignty."

I do not think that the conclusion of the majority of the court upon this question is by any means sustained by the array of authorities cited in the opinion. Few, if any of them, are decisive of the precise point presented.

The case of *Koehler* v. *Lange*, 60 Iowa, 543, which seems to be relied upon with much confidence in the opinion of the majority, decides a totally different proposition. The Constitution of Iowa provided that constitutional amendments might be proposed by one session of the General Assembly, and "entered on the journals with the yeas and nays taken thereon, and referred to the Legislature to be chosen at the next general election," and the same published for three months before such election, and, if agreed to by a majority of the members elected to each house of the next session, it should then be submitted to the people for adoption. The question arose whether or not the amendment had been properly proposed at the first (eighteenth) session of the General Assembly, the journals of that session disclosing the fact that the amendment as proposed at that session was materially different in phraseology from the one agreed to at the next session and voted upon by the people. It was contended on behalf of those who maintained the validity of the amendment that the joint resolution adopted at the next session agreeing to the proposed amendment was a conclusive determination of the fact that it had been legally proposed at the previous session, but the court (quoting the syllabus) said: "When the Eighteenth General Assembly proposed an amendment to the Constitution, a recital of such proposed amendment by the Nineteenth General Assembly, in a joint resolution agreeing to the same, is not conclusive upon the court as to the form of such amendment as originally proposed, nor as to whether the Eighteenth General Assembly actually agreed to the same in the manner required by the Constitution; and such recital does

not preclude and estop the courts, in a proper case, from examining the journals of the Eighteenth General Assembly, to ascertain whether or not the amendment, as originally proposed, was in fact the same as that recited and agreed to by the Nineteenth General Assembly, and whether or not it was legally and constitutionally agreed to by the Eighteenth General Assembly."

The several opinions of the court took a very wide range in discussing the question stated above, but nowhere was the question involved in the case at bar raised or discussed. It is therefore not an authority on this question. No question was involved there of the conclusiveness of the findings of a tribunal especially created to determine the result of an election upon a proposed amendment. On the contrary, the opinion in that case expressly recognized the force of former decisions of that court (*Ryan* v. *Varga*, 37 Iowa, 78; *West* v. *Whitaker, Id.* 598) holding that under a statute authorizing township trustees, upon presentation of the petition of one-third of the resident taxpayers, to order an election to vote a tax in aid of railroads, the decision by the trustees of the question whether or not the petition contained the requisite number was judicial, and could not be reviewed collaterally by the court.

The same court had previously held, in the case of *Baker* v. *Board,* etc., 40 Iowa, 226 (Chief Justice Day, who delivered the opinion of the court in *Koehler* v. *Lange,* also delivering the opinion in this case), that (quoting the syllabus) "the decision of the Board of Supervisors that a petition asking for a submission of the question of relocating a county seat is signed by a majority of the legal voters in the county is judicial, and is conclusive until set aside or reversed upon appeal, writ of error, certiorari or other method provided for direct review."

None of the decisions of the courts of Missouri, North Carolina, Indiana, Michigan, Wisconsin, California, Kansas, Minnesota or Alabama, in the cases cited by the majority, are upon the questions presented in the case at bar. At most, they only decide that the courts may declare proposed amendments to the constitution not legally adopted where it is shown that they have not been made in accordance with the requirements of the Constitution; but in none of them is the question raised or decided as to the powers of the legislative branch of government to create a

tribunal for the final and conclusive determination of the result of an election.

The North Carolina court, in the case cited by the majority, decided that a certain amendment had been legally adopted; and subsequently in the *Simpson* v. *Commissioners,* 84 N. C. 158, and *Cain* v. *Commissioners,* 86 N. C. 8, the same court held that the decision of the commissioners to the effect that a majority of the voters favoring the adoption of the provisions of a fence law was final, and could not be reviewed by the courts.

The Michigan court in the case cited by the majority merely held that an amendment had been submitted to the people at a general election as authorized by the Constitution, and had been legally adopted. The same court, in a later case (*Hipp* v. *Board,* etc., 62 Mich. 456) held that the decision of a board of commissioners announcing the result of an election for removal of a county seat was conclusive, and could not be reviewed.

The Minnesota case cited by the majority, instead of sustaining their views, held valid an amendment to the Constitution of that State upon grounds which would uphold the amendment we are now considering. That court held in the case cited that acquiescence by the officials and people in the terms of an amendment amounted to a ratification thereof. The court, speaking through Judge MITCHELL, said: "As ultimate sovereignty is in the people, from whom all legitimate civil authority springs, and inasmuch as in the inception of all political organizations it is this original and supreme will of the people which organizes civil government, a court has no right to inquire too technically into any mere irregularity in the manner of proposing and submitting to the people that which they have solemnly adopted and subsequently recognized and acted upon, as part of the fundamental law of the State. We doubt whether a precedent can be found in the books for the right of a court to declare void a constitution, or amendment to a constitution, upon such grounds. But, however this may be, there are, in our opinion, two conclusive reasons why the right to inquire into any irregularities in the mode and means by which this constitutional amendment was proposed and adopted must be now forever closed. First. Such irregularities if any, must be regarded as healed by the subsequent act of Congress admitting Minnesota into the Union.

Second. They must be deemed cured by the recognition and ratification of this amendment, as a part of the Constitution, by the State after its admission into the Union. This was done by the issue of the State railroad bonds, and accepting the security for the protection of the State under its provisions, etc."

Amendment No. 3, as well as several other amendments to the Constitution which are by this decision declared not to have been legally adopted, have for many years been acquiesced in and treated as a part of the organic law of the State by the people and by all the departments of government alike. Judges have sat upon the bench holding commissions from the Governor pursuant to the authority of this amendment. Officers of all departments of government have been appointed by the Governor to fill vacancies, and no one has heretofore questioned his power to do so. In fact, this court has upheld the validity of such appointments. For more than twelve years Amendment No. 2, which falls by this decision, has limited the right of every citizen to vote at elections to the payment of a poll tax, and no one has questioned its validity. For several years a road tax has been regularly levied and paid, without objection, in most of the counties of the State pursuant to Amendment No. 5, and its validity is yet to be adjudicated.

I do not mean to express the view that this amounts to a legal ratification of the amendments, but I mention the matter in order to call attention to the fact that the Minnesota decision cited by the majority in support of their views, instead of doing so, by the application of doctrines therein declared would uphold, instead of rendering invalid, the amendment we are now passing upon.

The two decisions of the Mississippi and New Jersey courts are the only cases cited in the opinion of the majority which, in any degree, tend to support their views on this question. The Mississippi case (*State* v. *Powell*, 77 Miss. 545) is not precisely in point, because it does not appear either that the Constitution or statutes of that State provide that the returns of the election shall be made to the Legislature or that that body shall ascertain and declare the result. Some of the reasons stated in the opinion in that case sustain the majority view, but, though it expresses the views of a court of great learning and ability, and

was delivered by a learned judge for whose opinions on any subject I entertain the utmost respect, I am unwilling to follow its lead, believing, as I do, that it is based upon unsound reasoning.

The New Jersey court bases its conclusions upon the fact that the proceedings in which the question of the adoption or rejection of the amendment was a direct and not a collateral attack upon the findings of the State board of canvassers, and that it was in that way subject to review. The court reached a conclusion upon the facts in accord with the findings of the State board, and approved the findings to the effect that the amendment had received the necessary majority, and had been legally adopted.

I am therefore firmly convinced that the majority have reached the wrong conclusion in this case, and, on account of the importance of the question, feel constrained to record my dissent therefrom.

I am authorized to say that Mr. Justice RIDDICK concurs in the views I have herein expressed.

